PEOPLE v ROSE

Docket No. 290936. Submitted June 15, 2010, at Lansing. Decided July 1, 2010. Approved for publication August 26, 2010, at 9:00 a.m.

A jury in the Allegan Circuit Court, George R. Corsiglia, J., convicted Ronald C. Rose of four counts of first-degree criminal sexual conduct and two counts of disseminating sexually explicit matter to a minor. Defendant appealed, arguing, in part, that he was deprived of his constitutional right to confront the witnesses against him when the court permitted one of the victims, JB, who was eight years old, to testify from behind a screen that prevented JB from being able to see the defendant, although the defendant could see her.

The Court of Appeals *held*:

1. The trial court erroneously relied on MCL 600.2163a, which allows the use of special arrangements necessary to protect the welfare of a witness, when it allowed the use of the witness screen because the statute makes no reference to witness screens. The error, however, did not warrant relief. The existence of the statute does not preclude trial courts from using alternative procedures permitted by law or court rule to protect witnesses. The relevant inquiries were whether the use of the screen violated defendant's right to confront the witnesses against him and whether the use of the screen violated defendant's right to due process and a fair trial.

2. The trial court's decision to permit use of the screen did not violate defendant's right to confront witnesses. Before a witness screen is used, a trial court must determine that the screen is necessary to protect a witness who would otherwise be traumatized by the presence of the defendant and that the emotional distress to the witness in the absence of the screen would be more than *de minimis*. The trial court in this case found that there was a high likelihood that testifying face to face with defendant would cause JB significant psychological harm and that she might not be able to ·testify at all in defendant's presence. Those findings were sufficient to warrant limiting defendant's right to confront JB face to face, especially in light of the fact that use of the screen preserved the other

elements of defendant's right of confrontation and thus adequately ensured the reliability of the truth-seeking process.

. 3. With regard to due process, the use of a screen that prevents a witness from being able to see the defendant is not inherently prejudicial in terms of undermining the presumption of the defendant's innocence and the inferences a jury might draw from the use of the screen. The record in this case did not support the conclusion that use of the screen actually prejudiced defendant.

4. Although the prosecution failed to comply with a discovery order, the trial court did not abuse its discretion by denying defendant's motion to preclude the prosecution's expert witness on child sexual abuse from testifying. The exclusion of a witness is an extreme sanction that should not be employed if the trial court can fashion a different remedy that will limit the prejudice to the party injured by the violation while still permitting the witness to testify. Defendant failed to establish that the trial court's decision to deny that sanction was outside the range of principled outcomes under the circumstances presented.

5. The trial court did not abuse its discretion by denying defendant's alternative motions for a new trial or an evidentiary hearing in light of a juror's associations with members of JB's family. Defendant had the burden to establish that the juror was not impartial or at least that the juror's impartiality was in reasonable doubt. Defendant presented no evidence that the juror was partial or evidence of juror misconduct that prejudiced him.

Affirmed.

CONSTITUTIONAL LAW — CONFRONTATION CLAUSE — PRESUMPTION OF INNOCENCE — WITNESSES — FACE-TO-FACE CONFRONTATION — SCREENS TO SHIELD WITNESSES.

The use of a screen that prevents a witness from being able to see the defendant is not inherently prejudicial; before it may allow the taking of a witness's testimony from behind a screen, the trial court must make case-specific findings that the screen is necessary to protect a witness who would otherwise be traumatized by the presence of the defendant and that the emotional distress to the witness in the absence of the screen would be more than *de minimis*.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, *Frederick Anderson*, Prosecuting Attorney, and *Judy Hughes Astle*, Assistant Prosecuting Attorney, for the people.

*A. Scott Grabel & Associates* (by *Scott Grabel*) for defendant.

Before: MURRAY, P.J., and SAAD and M. J. KELLY, JJ.

PER CURIAM. Defendant appeals as of right his convictions by a jury of four counts of first-degree criminal sexual conduct, MCL 750.520b, and two counts of disseminating sexually explicit matter to a minor, MCL 722.675. The trial court sentenced defendant to serve 25 years to 50 years in prison for each of his convictions of first-degree criminal sexual conduct and to serve 16 months to 24 months in prison for each of his convictions of disseminating sexually explicit matter to a minor. The court ordered that the sentences be served concurrently and with 50 days of sentence credit for time served on each. Because we conclude that there were no errors warranting relief, we affirm.

I. BASIC FACTS AND PROCEDURAL HISTORY

The present case has its origins in allegations of sexual abuse by JB against defendant, Ronald Carl Rose. JB is the youngest of five children. At the time of the trial, JB was eight years old. JB has a brother, RB, who is approximately two years older than her and has three older sisters who were each in their early twenties at the time of the trial. Rose's wife is JB's oldest sister.

Rose and his wife had a home within five to six miles of JB's parent's home in Allegan County. Although RB and JB lived with their parents, they spent a significant amount of time at Rose's home and often stayed overnight. In June 2007, JB revealed to her mother that Rose had been sexually assaulting her for some time. After JB's revelations, RB also indicated that Rose had exposed him to pornography and touched him inappropriately.

The prosecutor charged Rose with eight separate crimes on the basis of these revelations. The first four counts were for first-degree criminal sexual conduct committed against JB: one count for digital-vaginal penetration, one count for penile-vaginal penetration, one count for penile-oral penetration, and one count for penile-anal penetration. The prosecutor also charged Rose with accosting a minor for immoral purposes and with second-degree criminal sexual conduct. At trial, the prosecutor argued that the accosting charge was founded on Rose's provision of alcohol to JB and that the second-degree criminal sexual conduct charge was founded on Rose's touching of JB's chest. However, the prosecutor agreed to dismiss those charges after the close of her proofs because JB had not testified that Rose provided her with alcohol or touched her chest. The last two charges were for disseminating sexually explicit matter to JB and RB.

JB testified at trial about the timing and location of the abuse that she suffered. She said that the abuse occurred at Rose's house in the bedroom and living room. Sometimes her older sister was home, and sometimes she was even in the same room, but the sister did not see the abuse because she was asleep when "we did it in the back room." Sometimes the abuse occurred at night and sometimes during the morning.

She also described the nature of the abuse. She said Rose put his private part by her private part—by both the "back and the front." She said he had tried to put his private into her front private, but it just did not work and she told him it hurt. She said she was sideways on the bed and that white stuff came out of his private part and got on her leg and the bed. JB said that Rose "put his private in the back while I was on my stomach." She said he put it in her "bottom, but it

didn't go all the way in." It hurt and she told him. She said she knew that the white stuff came out again because she could feel it on her leg. She said that, a lot of times, he put his private into where her poop comes from.

She also testified that sometimes Rose would touch her front private with his fingers. She said he tried to make his finger go in, but it hurt. In addition, he made her put her "mouth on him" more than once. Sometimes he would touch his private part while she put her mouth on it and would move it in her mouth. He was lying on his back on the bed, and she was on her knees.

Finally, JB testified that Rose would sometimes show her and her brother movies: "They had girls on it and that had the exact same thing that he did to me." He also showed them magazines that had pictures of people with no clothes on. Rose told her that the movies were about having sex, and he would watch the movies with her and RB. He also sometimes had the movies on while he was doing stuff to her.

RB also testified at trial. He said he did not like going over to his older sister's house when Rose was there because he would show them bad stuff—videos and magazines with naked people. He would put the videos on, and the people in them would have sex. RB said that Rose told them that the videos showed how babies were made. Sometimes Rose would play with his penis in front of them. Rose would have his pants halfway down and would move his penis up and down. RB said that his older sister was never home when this happened.

Rose's defense was that he had been wrongfully accused. Specifically, he presented testimony—including the testimony of two of JB's older sisters—that suggested that JB's mother caused JB and RB to fabricate the allegations

in an effort to break up the marriage between Rose and JB's older sister.

The jury rejected Rose's defense and returned a verdict of guilty on each of the six remaining counts.

In October 2008, Rose moved for an evidentiary hearing or a new trial. In his motion, Rose argued that he was deprived of a fair trial when his trial counsel failed to timely object to the prosecution's failure to produce a written summary of the proposed testimony by its expert on child-sexual-abuse dynamics. He also argued that his counsel unreasonably failed to call an expert to rebut the medical testimony at trial. He further claimed that his trial counsel unreasonably failed to call a rebuttal witness, GA, who would have testified that JB's father told GA that he knew that Rose had done nothing wrong. Rose also argued that there was evidence that one of the jurors knew JB's aunts, GA and LB, as well as her uncle, BB. Rose alleged that this juror had worked with BB and may have heard things about the case at work. For these reasons, Rose asked the trial court to order hearings on the issues or grant a new trial.

In February 2009, the trial court issued an opinion and order denying Rose's motion for a new trial. The trial court determined that the evidence did not demonstrate grounds for relief on the basis of a juror's limited knowledge of a single witness, GA, who did not actually testify at trial. Further, the court noted that the affidavits proffered by Rose in support of his motion did not show that the juror had engaged in misconduct. Rather, the affidavits established the mere possibility that the juror might have been exposed to prejudicial remarks. This evidence, the trial court concluded, was insufficient to warrant relief.

This appeal followed.

## II. USE OF A WITNESS SCREEN

### A. STANDARDS OF REVIEW

Rose first argues that the trial court violated his rights under the state and federal constitutions, as well as MCL 600.2163a, when it permitted JB to testify from behind a screen that prevented her from being able to see Rose even though he could see her. Rose contends that the use of a witness screen is inherently prejudicial and that the United States Supreme Court has specifically disavowed the use of one-way screens to prevent a witness from being able to see a defendant. He also argues that the trial court failed to make the necessary findings in order to use the alternative procedures permitted under MCL 600.2163a and that, in any event, the use of a screen is not permitted under that statute.

This Court reviews de novo questions of constitutional law such as the right to confront witnesses. *People v Drohan*, 475 Mich 140, 146; 715 NW2d 778 (2006). However, this Court reviews for clear error the trial court's findings of fact underlying the application of constitutional law. See *People v Oliver*, 464 Mich 184, 191; 627 NW2d 297 (2001). This Court also reviews de novo the proper interpretation of a statute. *People v Martin*, 271 Mich App 280, 286-287; 721 NW2d 815 (2006).

### B. THE TRIAL COURT'S FINDINGS

On the first day of trial, the prosecutor moved for permission to use a screen during JB's testimony. The prosecutor stated that she made the motion because JB had indicated that she was afraid to testify in Rose's presence. The trial court agreed to take testimony from JB's therapist.

Jill VanderBent testified that she supervised nine therapists for Bethany Christian Services and that she

also counseled JB. VanderBent stated that she was treating JB for symptoms related to trauma, including nightmares, bedwetting, difficulty concentrating, zoning out, and anger outbursts. JB had also expressed fear about having to come and testify in court—that she did not want to see Rose and "was very fearful." JB had even stated that she feared that she could not testify in his presence. VanderBent stated that it was her opinion that testifying face to face might trigger some traumatic experiences and cause "numbing, shutting down, not being able to speak even." She opined that if JB were to see Rose, it could be traumatic for her, but the use of a screen that would permit others to see her without JB being able to see Rose would sufficiently safeguard her emotional and psychological well-being. Further, when asked whether JB "would be psychologically and emotionally unable to testify if we didn't have some sort of protection that goes beyond re-configuring the courtroom," VanderBent opined that it was "a likely possibility, yes."

On cross-examination, VanderBent continued to assert the high potential for harm if JB were forced to testify face to face with Rose:

> *Q.* Okay. Now, what do you predict for her mental health if she testifies? Or that she won't be able to testify or that she'll be harmed? Can you clarify that?
>
> *A.* Sure. The concern is with [JB] specifically because she had indicated to me that she's very fearful of seeing the defendant. If she has to testify in his presence there's concern that that would be a trigger for her which could cause her to exhibit some of these symptoms I had expressed; the numbing out, spacing out and possibly not even being able to speak.
>
> *Q.* Is she able to articulate this fear clearly?
>
> *A.* Yes.
>
> *Q.* Does she exhibit any symptoms of fear?

*A.* Yes. She's very fearful, very shaky, talks about being very nervous, stomach aches.

*Q.* This is related to testifying?

*A.* In front of the defendant.

*Q.* Specifically in front of the defendant.

*A.* Correct.

*Q.* Would she suffer any permanent emotional damage do you think?

*A.* That's hard to say.

\* \* \*

*Q.* Is there any particularly heightened effect on [JB] of testifying versus say any other witness in a traumatic case?

*A.* Well I think the difference in this particular case is that [JB] has expressed this fear of being in front of face to face to the defendant. Some, you know, it varies based on the child. However, because she has verbally expressed that this is very scary for her, shows me that this is something we need to try to prevent her from being so fearful. Because if she's too fearful and she becomes—her stress arousal happens, she's going to have a very difficult time expressing, verbalizing and accessing her memories.

Rose's trial counsel objected to the prosecutor's motion for permission to use a screen on the grounds that the prosecution had not met the requirements of MCL 600.2163a and because the use of the screen violated Rose's right to confront JB and was otherwise prejudicial. Nevertheless, Rose's trial counsel also argued that the trial court had to use the standard set forth in MCL 600.2163a(17) when deciding whether to use a screen: "The defendant asserts that that is the correct standard for the use of a witness screen. It would be the same for video recorded deposition testimony." Rose's trial counsel did not suggest any alternatives to the use of the screen, such as the methods stated under MCL 600.2163a(3), (4), (14), (16), and (17).

After hearing the parties' arguments, the trial court found that there was "a high likelihood" that testifying face to face with Rose would cause JB to "regress in her therapy, have psychological damage" and could cause her "to possibly not testify . . . ." For that reason, the trial court concluded that the criteria under MCL 600.2163a had been met and that it was necessary to use a screen to protect the welfare of the child. The trial court also determined that Rose's rights would be adequately protected because he would be able to see JB, as would the jury, and he would be able to cross-examine her.

### C. MCL 600.2163a

In this case, the trial court relied on MCL 600.2163a for the authority to use a witness screen. Under MCL 600.2163a(15), if the trial court finds, on the motion of a party, that "the special arrangements specified in subsection (16) are necessary to protect the welfare of the witness, the court shall order those special arrangements." The special arrangements listed under MCL 600.2163a(16) include excluding unnecessary persons from the courtroom during the witness's testimony, rearranging the courtroom to move the defendant as far from the witness stand as is reasonable, and using a questioner's stand or podium. If the court finds that the witness will be psychologically or emotionally unable to testify even with the benefits of the protections afforded under MCL 600.2163a(3), (4), (14), and (16), the court must order the taking of a videorecorded deposition of the witness in lieu of live testimony. MCL 600.2163a(17).

On appeal, Rose argues that the trial court erred to the extent that it relied on MCL 600.2163a because it failed to make the necessary findings under that statute and because the statute does not specifically permit the use of witness screens.

As noted, MCL 600.2163a requires the trial court to employ very specific protections, and none of these protections includes the use of a witness screen. Thus, the trial court could not have properly relied on MCL 600.2163a. Nevertheless, the trial court's erroneous reliance on MCL 600.2163a does not necessarily warrant relief. See *People v Burton*, 219 Mich App 278, 287; 556 NW2d 201 (1996) ("Additionally, even if it were error to apply the statute, it does not necessarily follow that defendant's right to confrontation was violated."). The Legislature provided that the protections afforded under MCL 600.2163a were "in addition to other protections or procedures afforded to a witness by law or court rule." MCL 600.2163a(19). Accordingly, while trial courts may rely on MCL 600.2163a to afford witnesses certain protections, the existence of this statute does not preclude trial courts from using alternative procedures permitted by law or court rule to protect witnesses. And trial courts have long had the inherent authority to control their courtrooms, which includes the authority to control the mode and order by which witnesses are interrogated. MRE 611(a); *People v Banks*, 249 Mich App 247, 256; 642 NW2d 351 (2002) ("It is well settled in Michigan that a trial court has broad discretion in controlling the course of a trial."). This inherent authority also includes the ability to employ procedures that limit a defendant's right to confront his accusers face to face even when the provisions of MCL 600.2163a do not apply. See *Burton*, 219 Mich App at 287-291. Thus, the trial court's erroneous reliance on MCL 600.2163a does not itself warrant relief. Rather, the relevant inquiry is whether the trial court's decision to use a witness screen violated Rose's Sixth Amendment right to confront JB or violated Rose's basic right to due process and a fair trial. See *Burton*, 219 Mich App at 287.

### D. THE RIGHT TO CONFRONT WITNESSES FACE TO FACE

The United States Supreme Court first addressed whether the use of a screen to shield a witness from viewing the defendant while testifying violated a defendant's constitutional right to confront the witnesses against him or her in *Coy v Iowa*, 487 US 1012; 108 S Ct 2798; 101 L Ed 2d 857 (1988). In *Coy*, the defendant was arrested and charged with sexually assaulting two 13-year-old girls while they were camping in their backyard. *Id.* at 1014. On the prosecutor's motion, the trial court permitted the complaining witnesses to testify from behind a screen. With adjustments to the lighting in the courtroom, the defendant could dimly see the witnesses, but the witnesses could not see the defendant. *Id.* at 1014-1015. On appeal in the United States Supreme Court, the defendant argued that the trial court violated his constitutional rights by permitting the screen because the Confrontation Clause gave him the right to face-to-face confrontation and because the screen eroded the presumption of innocence. *Id.* at 1015.

Justice Scalia, writing the majority opinion, noted that the Supreme Court has "never doubted . . . that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Id.* at 1016. He explained that the perception that confrontation is essential to fairness "has persisted over the centuries" because it "is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' " *Id.* at 1019. Moreover, Justice Scalia opined that the benefits of face-to-face confrontation outweighed the potential harms to the witness:

> Thus the right to face-to-face confrontation serves much the same purpose as a less explicit component of the Confrontation Clause that we have had more frequent occasion to discuss—the right to cross-examine the ac-

cuser; both "ensur[e] the integrity of the factfinding pro-
cess." The State can hardly gainsay the profound effect
upon a witness of standing in the presence of the person
the witness accuses, since that is the very phenomenon it
relies upon to establish the potential "trauma" that alleg-
edly justified the extraordinary procedure in the present
case. That face-to-face presence may, unfortunately, upset
the truthful rape victim or abused child; but by the same
token it may confound and undo the false accuser, or reveal
the child coached by a malevolent adult. It is a truism that
constitutional protections have costs. [*Id.* at 1019-1020
(citation omitted).]

Turning to the facts in the case before the Court,
Justice Scalia stated that it was "difficult to imagine a
more obvious or damaging violation of the defendant's
right to a face-to-face encounter." *Id.* at 1020. Although
he acknowledged that the Court had in the past stated
that the right to confront witnesses was not absolute,
Justice Scalia differentiated those prior holdings on the
ground that they did not involve the literal meaning of
the Confrontation Clause:

To hold that our determination of what implications are
reasonable must take into account other important inter-
ests is not the same as holding that we can identify
exceptions, in light of other important interests, to the
irreducible literal meaning of the Clause: "a right to *meet
face to face* all those who appear and give evidence *at trial.*"
*Id.* at 1020-1021 (citation omitted).

Justice Scalia did leave open the possibility that there
might be exceptions to the right to face-to-face confronta-
tion. *Id.* at 1021. Such an exception, he opined, would
"surely be allowed only when necessary to further an
important public policy." *Id.* However, such an exception
was not established through a "legislatively imposed pre-
sumption of trauma." *Id.* Rather, because there had been
no "individualized findings that these particular wit-
nesses needed special protection, the judgment here could

not be sustained by any conceivable exception." *Id.* For these reasons, the Court reversed the judgment of the Iowa Supreme Court and remanded the case for a harmless-error review. *Id.* at 1022.

Although Justice O'Connor was one of the six justices who signed Justice Scalia's opinion, she wrote a concurrence to clarify that the use of procedures "designed to shield a child witness from the trauma of courtroom testimony" might be permissible under facts different from those present in the case before the Court. *Id.* at 1022. Justice O'Connor acknowledged that the Confrontation Clause generally required that a witness face the defendant. However, she explained that this requirement was not absolute:

> But it is also not novel to recognize that a defendant's "right physically to face those who testify against him," even if located at the "core" of the Confrontation Clause, is not absolute, and I reject any suggestion to the contrary in the Court's opinion. Rather, the Court has time and again stated that the Clause "reflects a *preference* for face-to-face confrontation at trial," and expressly recognized that this preference may be overcome in a particular case if close examination of "competing interests" so warrants. [*Id.* at 1024 (citations omitted).]

Justice O'Connor went on to state that she would permit the use of a particular trial procedure that called for something other than face-to-face confrontation if that procedure were necessary to further "an important public policy." *Id.* at 1025. Moreover, although a mere generalized legislative finding of necessity is insufficient to establish such a necessity, when a court "makes a case-specific finding of necessity, as is required by a number of state statutes, our cases suggest that the strictures of the Confrontation Clause may give way to the compelling state interest of protecting child witnesses." *Id.* at 1025 (citations omitted).

Almost two years to the day after the decision in *Coy*, the United States Supreme Court clarified whether and to what extent there were exceptions to a defendant's right to confront witnesses face to face. See *Maryland v Craig*, 497 US 836; 110 S Ct 3157; 111 L Ed 2d 666 (1990). In *Craig*, the defendant was charged with physically and sexually abusing a six-year-old girl who attended a kindergarten and prekindergarten center owned and operated by the defendant. *Id.* at 840. Before trial, the prosecution moved to permit the child to testify by means of one-way closed-circuit television. *Id.* The trial court permitted the use of this procedure after first taking evidence and finding, as required under the relevant state statute, that the child witness and other child witnesses would suffer serious emotional distress to the extent that the children would not be able to reasonably communicate. *Id.* at 842-843. The Maryland Court of Appeals reversed the defendant's convictions because the prosecution's showing of necessity was insufficient under the decision in *Coy*. *Id.* at 843.

Writing for the majority, Justice O'Connor noted that the right guaranteed by the Confrontation Clause ensures not only a personal examination of the witness, but also that the witness will testify under oath, that the witness will be subject to cross-examination, and that the jury will have the opportunity to observe the witness's demeanor. *Id.* at 845-846. She explained that the benefits conferred by this right could not be reduced to any one element of confrontation:

> The combined effect of these elements of confrontation— physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings. [*Id.* at 846.]

This was even true of the core value of the Confrontation Clause—the right to face-to-face confrontation. *Id.* at 847 ("[W]e have nevertheless recognized that [face-to-face confrontation] is not the *sine qua non* of the confrontation right."). "For this reason, we have never insisted on an actual face-to-face encounter at trial in *every* instance in which testimony is admitted against a defendant." *Id.* Rather, as

> suggested in *Coy*, our precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured. [*Id.* at 850.]

Turning to Maryland's statutory procedure, Justice O'Connor noted that it did prevent a child witness from seeing the defendant as he or she testified. However, she found it significant that the remaining elements of the confrontation right were preserved: "The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies." *Id.* at 851. The presence of these elements "adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Id.* Because the procedure leaves sufficient safeguards in place, when the use of the procedure is necessary to further an important state interest, its use will "not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause." *Id.* at 852. Therefore, Justice O'Connor stated, the critical inquiry is whether use of the procedure is necessary to further an important state interest. *Id.*

Justice O'Connor reiterated that the Court had already recognized that the states have a compelling interest in protecting minor victims of sex crimes from further trauma and embarrassment. *Id.* And, on a similar basis, she concluded that a "State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Id.* at 853. But the state may not limit face-to-face confrontation unless the state makes an adequate showing of necessity. *Id.* at 855. The requisite finding is case-specific; the trial court must hear evidence and determine whether the procedure "is necessary to protect the welfare of the particular child witness who seeks to testify." *Id.* In order to warrant dispensing with face-to-face confrontation, the trial court must find that the emotional distress suffered by the child would be both caused by the presence of the defendant and more than *de minimis* distress caused by nervousness, excitement, or reluctance to testify. *Id.* at 856. Applying these standards to the Maryland procedure, Justice O'Connor determined that the statute's requirement that the trial court find that the child would suffer serious emotional distress to the extent that the child would not reasonably be able to communicate met the necessity requirements and, for that reason, was consonant with the Confrontation Clause. *Id.* at 856-857.

Following the decision in *Craig*, this Court adopted the test stated in *Craig* and determined that trial courts may limit a defendant's right to face his or her accuser in person and in the same courtroom. See *Burton*, 219 Mich App at 289 (holding that the trial court did not err when it permitted a mentally and physically challenged adult who was brutally physically and sexually assaulted to testify by way of closed-circuit television even

though the witness's situation did not meet the requirements of MCL 600.2163a); *People v Pesquera*, 244 Mich App 305, 309-314; 625 NW2d 407 (2001) (holding that the trial court properly allowed the child victims of sexual assault—ranging in age from four to six—to give videotaped depositions in lieu of live testimony under MCL 600.2163a); *People v Buie*, 285 Mich App 401, 408-410, 415; 775 NW2d 817 (2009) (adopting the test stated in *Craig* for determining whether a trial court may permit an expert witness to testify by way of videoconferencing). In order to warrant the use of a procedure that limits a defendant's right to confront his accusers face to face, the trial court must first determine that the procedure is necessary to further an important state interest. *Burton*, 219 Mich App at 288. The trial court must then hear evidence and determine whether the use of the procedure is necessary to protect the witness. *Id.* at 290. In order to find that the procedure is necessary, the court must find that the witness would be traumatized by the presence of the defendant and that the emotional distress would be more than *de minimis*. *Id.*

In this case, the trial court clearly found that the use of the witness screen was necessary to protect JB when it invoked MCL 600.2163a and stated that it was "necessary to permit this to protect the welfare of this child." In making its findings, the trial court also clearly referred to the fact that JB had expressed fear of Rose and that, given her age, the nature of the offenses, and her therapist's testimony, there was "a high likelihood" that testifying face to face with Rose would cause her to "regress in her therapy, have psychological damage" and could cause her "to possibly not testify . . . ." These findings were sufficient to warrant limiting Rose's ability to confront JB face to face. See *Craig*, 497 US at 856-857. In addition, aside from JB's inability to see

Rose, the use of the witness screen preserved the other elements of the confrontation right and, therefore, adequately ensured the reliability of the truth-seeking process. *Id.* at 851-852. Consequently, the trial court's decision to permit JB to testify with the witness screen did not violate Rose's right to confront the witnesses against him.

### E. DUE PROCESS AND THE PRESUMPTION OF INNOCENCE

We shall next address Rose's argument that the use of the witness screen was inherently prejudicial and violated his right to due process. Every defendant has a due process right to a fair trial, which includes the right to be presumed innocent. *Estelle v Williams*, 425 US 501, 503; 96 S Ct 1691; 48 L Ed 2d 126 (1976). Under the presumption of innocence, guilt must be determined solely on the basis of the evidence introduced at trial rather than on " 'official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.' " *Holbrook v Flynn*, 475 US 560, 567; 106 S Ct 1340; 89 L Ed 2d 525 (1986) (citation omitted). For that reason, courts must be alert to courtroom procedures or arrangements that might undermine the presumption of innocence. *Estelle*, 425 US at 503-504. However, not every practice tending to single out the accused must be struck down. This is because the jurors are understood to be "quite aware that the defendant appearing before them did not arrive there by choice or happenstance . . . ." *Holbrook*, 475 US at 567. Notwithstanding this, certain procedures are deemed to be so inherently prejudicial that they are generally not permitted at trial. See *Illinois v Allen*, 397 US 337, 344; 90 S Ct 1057; 25 L Ed 2d 353 (1970) (stating that "no person should be tried while shackled and gagged except as a last resort"); *Estelle*, 425 US at 504-505

(stating that it violates a defendant's due process right to a fair trial to compel a defendant to wear identifiable prison garb during trial). When determining whether a particular procedure is inherently prejudicial, courts examine whether there is an unacceptable risk that impermissible factors will come into play. *Holbrook*, 475 US at 570; see also *Estes v Texas*, 381 US 532, 542-543; 85 S Ct 1628; 14 L Ed 2d 543 (1965) (stating that questions of inherent prejudice arise when "a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process"). One important factor in determining whether a particular practice is inherently prejudicial is whether the practice gives rise primarily to prejudicial inferences or whether it is possible for the jury to make a wider range of inferences from the use of the procedure. *Holbrook*, 475 US at 569 ("While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable."). If a particular procedure is not inherently prejudicial, the defendant bears the burden of showing that the procedure actually prejudiced the trial. *Id.* at 572. However, when the procedure is inherently prejudicial, it will not be upheld if the procedure was not necessary to further an essential state interest. *Id.* at 568-569.

Surprisingly few courts have had the opportunity to address whether the use of a screen is inherently prejudicial under due process. As discussed earlier, the Court in *Coy* determined that the use of a screen without particularized findings establishing the necessity of its use violated the defendant's right to confront the witnesses against him. The Court did not address whether the use of a screen is inherently prejudicial

under due process. However, in his dissent, Justice Blackmun did address this issue and determined that the use of a screen was not inherently prejudicial:

> Unlike clothing the defendant in prison garb, *Estelle v Williams*, [425 US at 504-505] or having the defendant shackled and gagged, *Illinois v. Allen*, 397 U.S. 337, 344 [905 S Ct 1057; 25 L Ed 2d 353] (1970), using the screening device did not "brand [appellant] . . . 'with an unmistakable mark of guilt.' " See *Holbrook v Flynn*, 475 U.S., at 571, quoting *Estelle v Williams*, 425 U.S., at 518 (BRENNAN, J., dissenting). A screen is not the sort of trapping that generally is associated with those who have been convicted. It is therefore unlikely that the use of the screen had a subconscious effect on the jury's attitude toward appellant. See [*Holbrook*,] 475 U.S. at 570. [*Coy*, 487 US at 1034-1035 (Blackmun, J., dissenting).]

In contrast to this view, at least one state court has held that the use of a screen is inherently prejudicial. See *State v Parker*, 276 Neb 661; 757 NW2d 7 (2008), mod 276 Neb 965 (2009). The court in *Parker* explained that the use of a large screen to shield the victim from the defendant's view might have caused the jury to conclude that the trial court placed the screen "because the court believed her accusations were true." *Id.* at 672. Even if this connection were discounted, the court determined that there were no innocuous inferences that the jury could have made concerning the screen and numerous impermissible inferences:

> Instead, more akin to prison garb or shackles, the screen acted as a dramatic reminder of Parker's position as the accused at trial. The scene presented of the jurors watching Parker as he was forced to look onto a large panel instead of his accuser makes palpable the marks of shame and guilt caused by this looming presence in the courtroom. Nor can we ignore . . . the dramatic emphasis placed by the screen upon the State's key witness. In a case such as this, where the jury's assessment of the credibility of the accuser is so

crucial, the risk of these impermissible factors simply cannot be overlooked. [*Id.* at 673.]

We do not agree that the use of a screen is inherently prejudicial; rather, we agree with Justice Blackmun's conclusion that a screen is generally not the type of device that brands a defendant with the mark of guilt, such as wearing prison garb or being shackled and gagged. *Coy*, 487 US at 1034-1035 (Blackmun, J., dissenting). We also do not agree with the assertion in *Parker*, 276 Neb at 673, that the use of the screen can never be associated with innocuous events or give rise to a wider range of inferences beyond prejudicial ones. See *Holbrook*, 475 US at 569 (noting that the presence of guards does not necessarily give rise to impermissible inferences). Although a juror might conclude that the witness fears the defendant because the defendant actually harmed the witness, a reasonable juror might also conclude that the witness fears to look upon the defendant because the witness is not testifying truthfully. A reasonable juror could also conclude that the screen is being used to calm the witness's general anxiety about testifying rather than out of fear of the defendant in particular. Likewise, anytime a child victim testifies against a defendant who is accused of harming the child victim, the jury is going to reasonably infer that the child has some fear of the defendant. Finally, there are a variety of different screens and screening techniques that may be employed to shield a victim from having to see the defendant and, for that reason, the potential for prejudice will vary depending on the particular screen or screening technique employed. Accordingly, we cannot conclude that the use of a screen—no matter what its size or composition may be and no matter how it was employed at trial—must in every case be presumed to prejudice the defendant. See *id.* at 569 ("However, 'reason, principle, and common human

experience,' counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate.") (citation omitted); see also *Carey v Musladin*, 549 US 70, 72; 127 S Ct 649; 166 L Ed 2d 482 (2006) (holding that the state court did not misapply federal law when it determined that it was not inherently prejudicial for members of the public to wear buttons with the victim's image during the trial).

Moreover, the record in this case does not support the conclusion that the screen actually prejudiced Rose's trial. There is no evidence in the record that discloses the screen's appearance—we do not know its size, shape, or color or the nature of the materials used. In contrast to the court in *Parker*, this Court also has no record evidence concerning how the screen was stored in the courtroom or placed before JB testified. See *Parker*, 276 Neb at 672-673 (placing emphasis on the fact that the screen at issue was large and opaque and jutted curiously into the room and noting the manner in which it was put in place before the witness testified and concluding that, on the basis of the nature of the screen actually used, all screens are inherently prejudicial).

For this reason, we conclude that Rose has failed to meet his burden to show that the use of the screen prejudiced his trial. *Holbrook*, 475 US at 572.

Even if the use of a screen were inherently prejudicial, a trial court could nevertheless require a screen if its use were necessary to further an essential state interest. *Id.* at 568-569; see also *Parker*, 276 Neb 673 ("Having determined that the screen was inherently prejudicial, we subject the procedure to close judicial scrutiny and consider whether it was justified by an essential state interest specific to this trial."). The

United States Supreme Court has already held that the state has a compelling interest in protecting child witnesses from the trauma of testifying when the trauma would be the result of the defendant's presence and would impair the child's ability to testify. See *Craig*, 497 US at 855-857. And the trial court in this case found that the use of the screen was necessary in order to ensure that JB would be able to testify. Thus, the question is whether the trial court correctly determined that the use of the screen itself—as opposed to some other technique for shielding JB—was necessary under the facts of this case.

In *Parker*, the court recognized that the trial court had determined that the use of the screen was necessary to protect the child witness and ensure that she would be able to testify accurately and completely. *Parker*, 276 Neb at 673. However, the court still determined that the trial court erred because it "had available another equally effective method of protecting S.M. while procuring her testimony that would not have been inherently prejudicial to Parker's due process rights." *Id.* at 674. The court explained that videorecording or closed-circuit television would have been more effective because "the jury would not usually be specifically aware that the child was being shielded from the defendant. Instead, the jury could easily infer that the accommodation was standard procedure for children who, as common sense dictates, may be intimidated by the courtroom environment." *Id.* at 675.

We do not agree that a witness screen—even if assumed to be inherently prejudicial—could not be used under any circumstance because of the availability of videorecording or closed-circuit television. It is true that, in the analogous context of shackling, courts have held that, even if the trial court makes the necessary findings in support of using restraints, the defendant generally has the right to have the minimum level of restraints necessary to main-

tain safety and decorum and have held that the trial court must take steps to minimize any prejudice from the use of restraints. See *DeLeon v Strack*, 234 F3d 84, 87-88 (CA 2, 2000); *United States v Brooks*, 125 F3d 484, 502 (CA 7, 1997). Hence, the trial court had a duty to take steps that adequately protected JB from the trauma of testifying while minimizing the prejudice to Rose. Nevertheless, the analysis in *Parker* assumes that video is *always* preferable to the use of a screen because the use of video will *always* be less prejudicial. Yet a reasonable juror could just as easily infer that the child witness was recorded or inter-rogated in a separate room to shield the child from the defendant. This is especially true if the witness testifies through closed-circuit television with the parties' trial counsel present with the witness; in such a case, it will be patently obvious to the jury that the parties' trial counsel left the courtroom to interrogate the witness rather than bring the witness into the courtroom. Thus, the concern that the jury will infer that the court employed alternative procedures to protect the witness from the defendant is present for both the use of a screen and the use of video. Likewise, use of video equipment deprives the jury of the ability to see the witness in person and judge his or her reactions without the distorting effects created by the use of videorecording devices. For these reasons, even if the use of a screen were inherently prejudicial, under some circumstances a trial court might properly conclude that the use of a physical screening method would safeguard a defendant's rights better than the use of closed-circuit television or a recorded deposition. See *Holbrook*, 475 US at 572. Because Rose has not presented any evidence that the use of the screen occasioned more prejudice than an alternative method—indeed Rose's trial counsel did not even suggest use of another method—we conclude that Rose's claim under due process would fail even if we were to conclude that screens are inherently prejudicial.

### III. DISCOVERY SANCTION

#### A. STANDARDS OF REVIEW

Rose next argues that the trial court erred when it denied his motion to preclude testimony by Thomas Cottrell, who was the prosecution's expert on child-sexual-abuse dynamics. Specifically, Rose argues that the trial court abused its discretion by failing to preclude the testimony, even after it found that there had been a discovery violation, on the sole basis that the motion was untimely. Rose also argues that, to the extent that the trial court properly denied his motion as untimely, his trial counsel's failure to make the motion earlier constituted the ineffective assistance of counsel.

This Court reviews a trial court's decision regarding the appropriate remedy for a discovery violation for an abuse of discretion. *People v Davie (After Remand)*, 225 Mich App 592, 597-598; 571 NW2d 229 (1997). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *People v Yost*, 278 Mich App 341, 379; 749 NW2d 753 (2008). When there has been no evidentiary hearing and no findings of fact by the trial court, this Court reviews de novo the entire record to determine whether the defendant's trial counsel's representation constituted the ineffective assistance of counsel. *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

#### B. DISCOVERY VIOLATION

On the day before trial was to begin, Rose's trial counsel moved to preclude Cottrell from testifying at trial. Rose's counsel argued that exclusion was appropriate because the prosecution had failed to comply with the trial court's earlier discovery order that required the prosecution to supply a written curriculum

vitae for all expert witnesses as well as a written summary of the expert's proposed testimony and the basis for that testimony. Rose's counsel indicated that the prosecution's failure to comply with the discovery order prevented him from evaluating the expert's credentials or preparing for cross-examination.

On the second day of trial, the trial court addressed Rose's motion. The trial court found that the prosecution had not complied with the discovery order, but nevertheless refused to preclude Cottrell from testifying. The court found it noteworthy that the defense had known about the proposed expert for months:

> However, notice of Mr. Cottrell was given months ago and I don't—and there is no objection regarding Mr. Cottrell, as an expert, in respect to that matter until the day before this trial is commenced. This is a matter that could have been addressed weeks ago, months ago, it wasn't. So in this Court's opinion you waived that requirement. So that is denied. The Court will allow Mr. Cottrell to testify consistent with the decisions of the Supreme Court . . . .

Rose has not argued that Cottrell's testimony was inadmissible or that Cottrell was not competent to testify as an expert. Rather, Rose only argues that the trial court should have sanctioned the prosecution for failing to comply with the trial court's discovery order by precluding Cottrell from testifying—that is, Rose argues that the trial court should have precluded otherwise relevant and admissible testimony solely on the basis that the prosecution failed to give Rose a written copy of Cottrell's curriculum vitae and proposed testimony. Trial courts have the discretion to fashion an appropriate remedy for a discovery violation. *Davie*, 225 Mich App at 597-598. " 'The exercise of that discretion involves a balancing of the interests of the courts, the public, and the parties.' It requires inquiry into all the relevant circumstances, including 'the causes and bona

fides of tardy, or total, noncompliance, and a showing by the objecting party of actual prejudice.' " *Id.* at 598 (citations omitted). However, the exclusion of a witness is an extreme sanction that should not be employed if the trial court can fashion a different remedy that will limit the prejudice to the party injured by the violation while still permitting the witness to testify. *Yost*, 278 Mich App at 386.

Cottrell did not testify about the substantive facts of this case; as he noted on cross-examination, he had not interviewed any person related to the case and had not reviewed any reports. Rather, his testimony was limited to explaining certain behaviors commonly engaged in by the perpetrators and victims of child sexual abuse. Given the nature of this testimony, Rose's trial counsel did not require significant advance notice in order to prepare for Cottrell's cross-examination. Further, although the prosecution failed to comply with the discovery order, Rose's trial counsel had notice months before trial that the prosecution intended to have Cottrell testify and could have requested the documentation at any point before trial and remedied any prejudice occasioned by the failure to submit the summary. Moreover, Rose's counsel did not ask the trial court to postpone Cottrell's testimony in order to give him more time to prepare; instead, he asked for the extreme sanction of preclusion. There was also no evidence that Rose's trial counsel was actually unable to effectively cross-examine Cottrell at trial. Given the nature of the testimony, the fact that any minimal prejudice could readily have been cured had Rose's trial counsel raised the issue earlier, and the absence of any evidence of prejudice, we conclude that the trial court's decision to deny Rose's motion to preclude Cottrell from testifying was within the range of reasonable and principled outcomes. *Yost*, 278 Mich App at 379.

### C. INEFFECTIVE ASSISTANCE OF COUNSEL

Rose also argues on appeal that his trial counsel was ineffective for failing to move to preclude Cottrell from testifying earlier. "To establish ineffective assistance of counsel, the defendant must first show: (1) that counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms, and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Id.* at 387.

On this record, Rose's trial counsel's decision not to move to exclude Cottrell's testimony earlier cannot be said to fall below an objective standard of reasonableness. The decision whether and when to make a motion are matters of trial strategy and professional judgment that are entrusted to a defendant's trial counsel. *People v Traylor*, 245 Mich App 460, 463; 628 NW2d 120 (2001). And Rose's trial counsel may reasonably have concluded that the trial court would not grant a motion to exclude Cottrell's testimony at a point sufficiently in advance of trial to correct the discovery violation. Instead, counsel may have thought that the best point to make the motion was immediately before trial when he could reasonably argue that the deficient discovery would prevent him from adequately preparing. Therefore, on this record, we cannot conclude that the decision of Rose's trial counsel fell below an objective standard of reasonableness under prevailing professional norms.

Likewise, given the limited nature of Cottrell's testimony and the trial court's ability to fashion a less extreme sanction, it is highly unlikely that the trial court would have precluded Cottrell from testifying had his counsel filed the motion earlier. See *Yost*, 278 Mich App at 386 (noting that trial courts should, when able, fashion a remedy short of exclusion). Indeed, in its opinion and

order denying Rose's motion for a hearing or new trial, the court essentially asserted the same thing. Rose has also not presented any evidence that, had his counsel had more time to prepare, he might have more effectively challenged Cottrell's testimony on cross-examination. Accordingly, Rose has failed to show that his trial counsel's failure to seek preclusion earlier prejudiced his trial.

The trial court did not abuse its discretion when it denied Rose's motion to preclude Cottrell from testifying, and Cottrell's trial counsel was not ineffective for failing to make the motion earlier.

### IV. JUROR ISSUES

#### A. STANDARDS OF REVIEW

Finally, Rose argues that the trial court abused its discretion when it denied his motion for a new trial on the basis of a juror's failure to disclose his familiarity with JB's family. In the alternative, he argues that the trial court abused its discretion when it denied his motion for an evidentiary hearing to explore this juror's knowledge and to evaluate whether his trial counsel would have sought to dismiss the juror had he known of the connection.

This Court reviews for an abuse of discretion a trial court's decision concerning whether to grant a motion for a new trial. *People v Brown*, 279 Mich App 116, 144; 755 NW2d 664 (2008). This Court also reviews for an abuse of discretion a trial court's decision concerning whether to hold an evidentiary hearing. *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008).

#### B. NEW TRIAL OR EVIDENTIARY HEARING

On appeal, Rose argues that the trial court should have granted him a new trial because there was evi-

dence that one of the jurors knew people who were related to the victim and failed to disclose that information to the court during voir dire. At the very least, Rose contends, the trial court should have held an evidentiary hearing to determine the full extent of the juror's knowledge and to learn whether his trial counsel would have exercised a peremptory challenge had he known that the juror knew members of the victim's extended family.

A criminal defendant has the right to be tried by an impartial jury. *People v Miller*, 482 Mich 540, 547; 759 NW2d 850 (2008). A juror's failure to disclose information that the juror should have disclosed may warrant a new trial if the failure to disclose denied the defendant an impartial jury. *Id.* at 548. "The burden is on the defendant to establish that the juror was not impartial or at least that the juror's impartiality is in reasonable doubt." *Id.* at 550.

During voir dire in the present case, the potential jurors were asked if they knew any of the witnesses in the case, who included several members of JB's family. Each of the witnesses from JB's family was from her immediate family. Juror No. 168 did not indicate that he knew any of these witnesses. However, on the third day of trial, Juror No. 168 brought to the trial court's attention that he might have known a potential witness.

Juror No. 168 told the court that he thought the witness was GA, whom he had known in junior high school approximately 40 years ago. Rose's trial counsel indicated that he did have a potential rebuttal witness named GA. When asked, the juror told the court that he had not had any contact with GA since junior high school. The trial court then asked the juror whether he would treat the witness any differently or whether he would evaluate her testimony by the same standards as

every other witness. The juror responded that he would treat her the same as any other witness. After this, the trial court indicated that it was "satisfied there's no problem."

After the verdict, Rose's new counsel filed a motion for a new trial and eventually submitted three affidavits in support of that motion. The affidavits were by the victims' aunts, GA and LB, and their uncle, BB.[1] In their affidavits, GA and LB averred that on the first day of trial they went to lunch in a restaurant and discussed the case in the presence of a person they later realized was Juror No. 168. They both indicated that Juror No. 168 did not give any sign that he recognized them. In his affidavit, BB averred that he had become acquainted with Juror No. 168 at work before trial and that the juror told him that he remembered BB's family, but was more familiar with BB's sisters, GA and LB. From this evidence and the fact that Juror No. 168 told the court that he knew GA, Rose argues that it is clear that Juror No.168 knew JB's family and failed to spontaneously disclose that information to the court. This, he further argues, amounted to juror misconduct that warrants a new trial.

Although these affidavits are evidence that Juror No. 168 might have known members of JB's extended family at one time, there was no evidence that Juror No. 168 actually knew any of the members of JB's family who were identified as potential witnesses before trial. It is also undisputed that the potential jurors were not asked whether they knew GA. Accordingly, there was no evidence that the juror misled the court when he denied knowing any of the potential witnesses. Further, the juror's own statements on the third day of trial and the

---

[1] In the affidavits, the affiants used their formal names. However, for ease of reference, we have referred to them by their initials as used at trial.

affidavits demonstrated that the juror's knowledge of the family was limited to decades-old interactions and limited recent interactions at work. BB himself averred that Juror No. 168 did not at first know him from work, but only learned that BB was a member of the family after BB approached him and disclosed this fact. Further, there was no evidence that Juror No. 168 actually knew JB's father or his immediate family members. Finally, the mere fact that Juror No. 168 might have known the victims's aunts and uncles to some limited degree did not establish that the juror harbored any bias against or in favor of the family. Absent evidence that Juror No. 168 was partial, Rose has failed to establish the prejudice required in order to warrant a new trial on the basis of Juror No. 168's failure to spontaneously bring up the fact that he knew some members of JB's family before the trial began. See *Miller*, 482 Mich at 553-554. Accordingly, the trial court did not err when it refused to grant Rose a new trial on the grounds of juror misconduct.

For similar reasons, the trial court did not err when it denied Rose's motion to hold an evidentiary hearing concerning whether and to what extent Juror No. 168 might have known members of JB's family. In this case, although there was evidence that Juror No. 168 might have had some limited knowledge of the family, there was no evidence that Juror No. 168 was partial. Instead, Rose essentially invited the trial court to speculate that Juror No. 168 might have had some bias on the basis of his purported failure to disclose his knowledge of the family. However, the mere possibility of prejudice is insufficient to warrant relief. *People v Nick*, 360 Mich 219, 227; 103 NW2d 435 (1960). And absent more concrete evidence tending to suggest bias, the trial court was well within the range of principled outcomes when it declined Rose's motion for an evidentiary hearing.

Finally, we note that, in his motion for a new trial and supporting affidavits, Rose argued that Juror No. 168 was potentially exposed to outside information about the case. However, on appeal, Rose has not addressed this argument by reference to law or facts. Therefore, we conclude that Rose has abandoned these alternative claims of juror impropriety. *Martin*, 271 Mich App at 315.

There were no errors warranting relief.

Affirmed.