# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

TYRELL LAMAR BAKER,

      Defendant-Appellant.

UNPUBLISHED
December 4, 2018

No. 338799
Wayne Circuit Court
LC No. 16-008922-01-FC

---

Before: O'BRIEN, P.J., and TUKEL and LETICA, JJ.

PER CURIAM.

Defendant, Tyrell Lamar Baker, appeals by right his jury convictions of second-degree murder, MCL 750.317, as a lesser offense of premeditated murder, MCL 750.316; carrying or possessing a firearm while ineligible to do so (felon-in-possession), MCL 750.224f; and carrying or possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The charges arose from the shooting death of Ali Beydoun in the early morning hours of September 19, 2016. For the reasons explained below, we affirm.

## I. JURISDICTIONAL CHALLENGE

We first address the prosecution's contention that this Court lacks jurisdiction to hear Baker's appeal as an appeal of right. Specifically, the prosecution maintains that Baker had to file his appeal of right within 42 days after entry of his judgment of sentence, but he actually filed it 69 days after entry of the judgment. Whether this Court has jurisdiction is always within the scope of this Court's review. See *Chen v Wayne State Univ*, 284 Mich App 172, 191; 771 NW2d 820 (2009). Our Supreme Court's court rules generally govern this Court's jurisdiction to hear an appeal of right. *Id.* at 192. And this Court reviews de novo the proper interpretation and application of the court rules. *Id.* at 191.

On appeal, the prosecution takes the position that under MCR 7.204(A)(2)(a) *and* (c), Baker and the trial court had to comply with the requirements stated under MCR 6.425(G)(3) and that Baker had to file his claim of appeal within 42 days of the entry of judgment before the

-1-

claim could be treated as timely. The construction of the rule, however, demonstrates otherwise.[1]

MCR 7.204(A)(2) provides, in pertinent part:

An appeal of right in a criminal case must be taken

(a) in accordance with MCR 6.425(G)(3);

(b) within 42 days after entry of an order denying a timely motion for the appointment of a lawyer pursuant to MCR 6.425(G)(1);

(c) within 42 days after entry of the judgment or order appealed from; or

(d) within 42 days after the entry of an order denying a motion for a new trial, for directed verdict of acquittal, or to correct an invalid sentence, if the motion was filed within the time provided in MCR 6.419(C), 6.429(B), or 6.431(A), as the case may be.

Contrary to the prosecutor's reading, MCR 7.204(A)(2) provides that a criminal defendant must take his or her appeal of right within 42 days of alternative events.[2] This construction is plain in light of our Supreme Court's placement of the word "or" between the last two clauses. See MCR 7.204(A)(2)(c). By using the disjunctive, our Supreme Court made it clear that the requirements stated under MCR 7.204(A)(2)(a)-(d), which are each separated by semicolons, were alternate bases with which to take a timely appeal. See *Yankee Springs Twp v Fox*, 264 Mich App 604, 608; 692 NW2d 728 (2004) ("The disjunctive term 'or' refers to a choice or alternative between two or more things."). Accordingly, a defendant's appeal is timely if taken in accordance with MCR 6.425(G)(3) *or* taken within 42 days after entry of an order denying a timely motion for appointment of counsel under MCR 6.425(G)(1) *or* taken within 42 days after entry of the judgment of sentence *or* taken within 42 days after the entry of certain post-trial motions. See MCR 7.204(A)(2)(a)-(d).

Under MCR 7.204(A)(2)(a), the first way to effectuate an appeal of right is through compliance with MCR 6.425(G)(3), which provides as follows:

In a case involving a conviction following a trial, if the defendant's request for a lawyer, timely or not, was made within the time for filing a claim of

---

[1] Both MCR 7.204 and MCR 6.425 were recently amended, but our citation and reference to those rules herein are to the preamendment versions applicable at the time relevant to this appeal.

[2] Although MCR 7.204(A)(2)(a) does not expressly mention a 42-day deadline, the incorporated court rule, MCR 6.425(G)(3), requires that the request for appellate counsel be "made within the time for filing a claim of appeal," which in turns returns one to MCR 7.204(A)(2)(c). Under MCR 7.204(A)(2)(c), the time for filing a claim of appeal in a criminal case is within 42 days of the judgment of sentence.

appeal, the order described in subrules (G)(1) and (2) must be entered on a form approved by the State Court Administrative Office, entitled "Claim of Appeal and Appointment of Counsel," and the court must immediately send to the Court of Appeals a copy of the order and a copy of the judgment being appealed. . . . *Entry of the order by the trial court pursuant to this subrule constitutes a timely filed claim of appeal for the purposes of MCR 7.204.* [Emphasis added.]

Under MCR 6.425(G)(3), the trial court must appoint a lawyer to represent an indigent defendant on appeal if the defendant requests the appointment of counsel within the time for filing an appeal of right, i.e., within 42 days after the entry of the judgment of sentence, see Note 2, *supra*. In this case, the trial court sentenced Baker on April 4, 2017. On April 11, 2017, Baker asserted to the court that he was indigent and requested the appointment of appellate counsel. Because Baker filed his request within 42 days of the entry of the judgment of sentence, the trial court was required to grant his request if it determined that Baker was indigent. See MCR 6.425(G)(1)(b); MCR 6.425(G)(3). Although the trial court received the request in April 2017, for some reason it did not order the appointment of appellate counsel until June 2, 2017. Nevertheless, even though the trial court delayed entry of the order, once it entered the order granting Baker's timely request for appointment of appellate counsel, that order "constitute[d] a timely filed claim of appeal for purposes of MCR 7.204." MCR 6.425(G)(3). Therefore, with MCR 6.425(G)(3) having been satisfied, Baker's appeal of right is timely under MCR 7.204.

## II. SUFFICIENCY OF THE EVIDENCE

We next address Baker's claim that the prosecution failed to present sufficient evidence to support his conviction of second-degree murder of Ali Beydoun. This Court reviews a challenge to the sufficiency of the evidence by examining the "record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009).

On appeal, Baker only argues that that there was insufficient evidence to show it was he who shot and killed Beydoun. Identity is an element of every offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). The prosecution is not required to prove identity with direct evidence; circumstantial evidence and the reasonable inferences drawn from that evidence can be sufficient to prove the elements of a crime. See *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Moreover, this Court must consider all the inferences that can be fairly drawn from the evidence when determining whether the prosecutor presented sufficient evidence because, when evidence is relevant and admissible, "it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). In such cases, it is for the fact-finder alone to "determine what inferences may be fairly drawn from the evidence and determine the weight to be accorded those inferences." *Id.* In this case, there was strong circumstantial evidence that it was Baker who shot and killed Beydoun.

Mahmoud Harajle and Sarah Emmick-Brown both testified that they lived at the home where the events occurred on the night at issue. They stated that Brown's friend, Cassie Welch,

had come over earlier to visit. They both knew Baker and knew that he was the father of two of Welch's children. Harajle and Brown testified that Welch had been on the phone with Baker and that she was arguing with him. Harajle further stated that he heard Baker and thought he was angry. Harajle, Brown, and Welch all testified that Baker arrived within minutes of the phone call ending. Harajle testified that his friend, Beydoun, had arrived on his motorcycle just minutes earlier to visit, but had not yet come inside. Brown agreed that Beydoun had not yet come inside when Baker arrived.

Harajle, Brown, and Welch all agreed that Baker was armed with a long gun when he arrived and each opined that it was an AK-47 or similar rifle. Harajle and Brown both testified that immediately after Baker entered the house, he yelled at Welch, "[W]hy aren't you with the kids, bitch," and then Baker slapped Welch. Brown said that after she heard the slap, she came into the room, where she saw Welch holding her face and picking up her glasses off the ground. Harajle and Brown both testified that Baker just stood there, then walked back toward the door, turned, stared at them for a moment, and left the house.

Harajle testified that, after Baker left the house, he heard him and Beydoun speaking to each other, although Harajle was unable to make out the actual words. Harajle and Brown both testified that within seconds of Baker going outside, they heard multiple gunshots. Brown stated that the front door was open and that she saw Beydoun on the ground. They all went outside, and Welch called 911. Harajle stated that he saw Baker "jump" into a car parked in front of the home and Harajle saw the car drive off.

There was also testimony that officers recovered six 7.62 mm x 39 mm shell casings from the yard near Beydoun's body and that all six shell casings were fired from the same weapon. The shell casings were typical ammunition for an AK-47 or SKS-style rifle. The medical examiner testified that Beydoun died after having been shot four times and stated that all four shots were through-and-through injuries.

The testimony and evidence was sufficient to establish that Baker shot and killed Beydoun, notwithstanding the fact that none of the witnesses actually saw him fire any of the shots. The witnesses' testimony established that Baker and Welch argued on the phone and that Baker was angry. The evidence also shows that when Baker arrived at the house, he was carrying a gun similar to an AK-47 and that right after Baker left the house, he exchanged words with Beydoun, after which gunshots were fired. Further, there was evidence that the shell casings recovered from the scene were consistent with the type of rifle Baker was carrying at the time. Therefore, considering all the evidence in the light most favorable to the prosecution, a reasonable jury could find that Baker was armed with an AK-47 or similar rifle when he left the home, that he encountered Beydoun as he left the home, had words with him, and then shot and killed him before getting into a car and leaving the scene.

Baker asserts that the evidence was insufficient because it was possible that some other person might have shot Beydoun. But the prosecution did not have "to disprove every reasonable theory consistent with innocence" to establish the elements of the crime beyond a reasonable doubt. See *Nowack*, 462 Mich at 400. Rather, the prosecution need only present sufficient evidence to convince the jury in the face of whatever contradictory evidence that the

defense may provide. *Id.* Here, the possibility that someone else shot Beydoun was so remote that it cannot even be characterized as a reasonable theory consistent with innocence.

As a result, Baker's claim fails because the prosecution presented sufficient evidence to establish Baker's identity as the person who shot and killed Beydoun.

### III. UNRELATED HOMICIDE AND LAY OPINION TESTIMONY

Baker also argues on appeal that the trial court erred when it allowed the prosecution to present evidence of an unrelated shooting and homicide involving a suspect named Shawn Salone. He further argues that the trial court abused its discretion when it allowed the officer in charge of the investigation, James McDonald, to testify about his opinion regarding Baker's use of the term "slam dunk" in a recording of a call from the county jail.

This Court reviews a trial court's evidentiary decisions for an abuse of discretion. See *Roper*, 286 Mich App at 90. A trial court abuses its discretion when its decision falls outside the range of reasonable outcomes. *Yost*, 278 Mich App at 379. This Court, however, reviews de novo the proper interpretation and application of the rules of evidence. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013).

Relevant evidence is generally admissible. See MRE 402; *Roper*, 286 Mich App at 91. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Evidence that a defendant threatened a witness is relevant and admissible to prove consciousness of guilt. See *People v Sholl*, 453 Mich 730, 740; 556 NW2d 851 (1996). The same is true of evidence that the defendant otherwise tried to coerce or influence the witnesses against him or her where the attempt suggests consciousness of guilt. See *People v Mock*, 108 Mich App 384, 389; 310 NW2d 390 (1981).

In this case, the prosecution presented seven recordings of telephone conversations that Baker had with various persons.[3] In the first six recordings, Baker complained about Harajle, Brown, and Welch, who were the witnesses against him. The context suggested that Baker wanted someone to do something about the witnesses. Baker, for example, indicated to one person that he would send paperwork from his case to her so that she could disseminate the information to others. He even provided Welch's address to one caller and referred to the fact that the witnesses would be testifying at his then-upcoming preliminary examination. Notably, Welch did not appear for the preliminary examination, which Baker acknowledged in a later conversation.

Baker also repeatedly referred to someone called "Shawn" as the person who was supposed to take care of his problem with the witnesses. However, Baker never directly spoke to Shawn in the recordings. Baker also explained in one call that Shawn had gone to take care of

---

[3] We will refer to the calls as Calls #1 through #7. Calls #1 through #6 were admitted at trial as Exhibit 38, and Call #7 was admitted at trial as Exhibit 48.

the problem but did not go through with it because of a "fishy" truck on the street. Although Baker referred to Shawn in the conversations, it was not explicitly clear who Shawn was or what Baker wanted Shawn to do. McDonald informed the jury that there was a Shawn Salone whose street name was "Don Juan," but McDonald's testimony did not rectify the ambiguity with the identity of the person referred to by Baker in the recordings and did not clarify what it was that Baker wanted from Shawn.

Later in the trial, the prosecution admitted a more recent jail call. In Call #7, Baker stated that he wanted "M, C, and S" to be "slam dunked." Baker informed the other party that he was speaking in "code."[4] When told that Shawn had been picked up by the police, Baker acknowledged that he had heard that Shawn had "slam dunked" someone called "Jamaican" and another person. He stated that he wanted to "cuss" Shawn out for getting himself into trouble over another matter, which prevented Shawn from handling the problem with the witnesses against Baker.

Baker's statements in the calls suggested that he wanted someone to do something to influence or prevent the testimony by Harajle, Brown, and Welch, which would be relevant as consciousness of guilt. *Sholl*, 453 Mich at 740. Baker's reference to having the witnesses "slam dunked" suggests physical harm, but—without further information—the jury would have to speculate about whether Baker wanted someone to seriously harm the witnesses. The context also left unresolved whether he actually solicited someone to carry out whatever it was that he was contemplating. The prosecution could only resolve these deficiencies by providing the jury with context within which to evaluate the statements that Baker made in the recordings.

McDonald informed the jury that Salone had been arrested and charged with crimes arising from the shooting of two people. He stated that one victim died and the other, who was known as "Jamaica" or "Jamaican," did not. McDonald's testimony about the unrelated shooting provided the jury with much needed context. In Call #7, Baker referred to Shawn being caught for a "slam dunk" involving someone called Jamaican. McDonald's testimony about the shooting involving Salone and a person called Jamaican resolved the doubt about the identity of the person about whom Baker was speaking in the jail calls. McDonald's testimony also clarified that Salone's involvement included a shooting and a death. Baker's statement, when considered in the context provided by McDonald's testimony, made it highly likely that Baker used the term "slam dunk" to mean kill or, at the very least, shoot.

Taken together with the statements that Baker made in the seven calls, McDonald's testimony made it more likely that Baker was referring to Salone when he talked about "Shawn," see MRE 401, and that Baker wanted Salone to shoot or kill Harajle, Brown, and Welch to keep them from testifying against him. McDonald's testimony therefore was relevant to establish not only that Baker expressed a desire to harm the witnesses, but had in fact taken steps to do so, which was proof of consciousness of guilty. *Sholl*, 453 Mich at 740. Additionally, the context

---

[4] The prosecution argued that "M, S, and C" represented the initials for the first names of the witnesses in this case, Mahmoud Harajle, Sarah Emmick-Brown, and Cassie Welch.

provided by McDonald's testimony made it more likely that Baker's remarks were not merely puffery or improper expressions of exasperation with being falsely accused. See *id.* (stating that it is for the jury to determine the significance of a threat against witnesses in conjunction with all the other evidence). Consequently, the trial court did not err when it determined that McDonald's testimony was relevant.[5] See MRE 401. Because the testimony was relevant, it was admissible absent some other basis for excluding it. See MRE 402.

Relevant evidence may be excluded from admission notwithstanding its relevance if, in relevant part, "its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403. Although McDonald's testimony was plainly prejudicial, i.e., harmful to defendant, it was not *unfairly* prejudicial. See *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995) ("All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible."). McDonald did not get into details about the shooting and death involving Salone and Jamaican. Instead, he provided the bare minimum necessary to establish Salone's identity as the person to whom Baker referred in his calls and to provide the necessary context for evaluating what Baker meant when he referred to slam-dunking M, S, and C. There was, for that reason, no probability that "evidence which [was] minimally damaging in logic [would] be weighed by the jurors substantially out of proportion to its logically damaging effect." *Id.* at 75-76 (quotation marks and citation omitted). Importantly, there was no attempt to link Baker with this other murder and attempted murder. Thus, there is no reason to think that the jury somehow viewed Baker more negatively based on the fact that Salone had killed someone else.

In addition, the trial court gave the jury a proper limiting instruction regarding the use of such evidence. The trial court instructed that it was for the jury to determine whether Baker in fact made statements about the witnesses and what weight to give those statements. The court clarified that such statements could be made for innocent reasons, such as bravado or to impress the person to whom the person was talking. But the court also instructed the jury that the statements might reflect consciousness of guilt. The court similarly informed the jury that it did not have to believe McDonald's opinion that Baker used the term slam dunk to mean murder. Rather, the court instructed the jury to evaluate McDonald's testimony in light of what Baker actually said and determine whether his opinion made sense in light of all the other evidence in the case. The court also told the jury that it should decide whether to believe McDonald and decide how important his opinion was.

The trial court's instructions limited the potential prejudice and clarified that it was for the jury to decide whether and to what extent Baker's statements represented consciousness of guilt. See *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003) ("Jurors are

---

[5] Although the trial court mentioned that defense counsel "opened the door" to further exploration of the unrelated shooting by questioning the prosecution's firearms expert about the .30-caliber shell casings discussed in the expert's report, it is evident that the trial court founded its decision to allow McDonald's testimony on traditional principles of relevance and prejudice. See MRE 401; MRE 402; MRE 403.

presumed to follow their instructions, and instructions are presumed to cure most errors."); see also *Roper*, 286 Mich App at 106 (stating that a proper limiting instruction can safeguard a defendant's rights). The trial court did not err when it allowed the admission of McDonald's testimony about the shooting involving Salone and the Jamaican to provide the jury with the necessary context to evaluate whether Baker tried to influence the witnesses against him and whether he did so out of a consciousness of guilt. See *Sholl*, 453 Mich at 740.

Baker also complains that McDonald should not have been allowed to testify that, as used by Baker, "slam dunk" meant murder. He argues that McDonald was not qualified as an expert and that a lay witness cannot explain to a jury what inferences to draw from a recorded conversation involving ordinary language. It is true that a lay witness's testimony may improperly invade the province of the jury if the witness offers an opinion or inference when the witness is in no better position than the jury to evaluate the evidence. See *People v Fomby*, 300 Mich App 46, 52-53; 831 NW2d 887 (2013); but cf. MRE 701 (allowing in some circumstances lay witnesses to provide opinion testimony). However, assuming that McDonald's testimony did improperly provide opinion on an issue that the jury was already well equipped to evaluate, reversal would still not be warranted. While the prosecution's case was based primarily on circumstantial evidence, the circumstantial evidence was very strong. Even without considering McDonald's testimony describing "slam dunk" as murder, the jury most certainly would have come to the same conclusion due to the compelling evidence showing that Baker wanted Shawn to "slam dunk" people and Baker describing that Shawn had indeed "slam dunked" two other people, when it was shown that those people were shot and one of them was killed. Therefore, any error was harmless because Baker has failed to show that "it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999).[6]

## IV. PRIOR TESTIMONY AND OTHER-ACTS EVIDENCE

We next address Baker's argument that the trial court erred when it allowed the prosecution to read Welch's testimony from an examination under oath pursuant to an investigative subpoena. See MCL 767A.1 *et seq*. Under the same issue, Baker argues that the trial court erred when it allowed Welch to testify that Baker physically abused her, that his family was "crazy," and that he knew someone from jail.

---

[6] Indeed, even if the jury had not been presented with *any* evidence of Baker's attempts or desires to silence the witnesses in this case—not just McDonald's opinion testimony on the meaning of "slam dunk"—there is virtually no chance that the jury would have deviated from its verdicts. This other evidence showed that Baker had been angry and had brought an AK-47-type rifle to the house and immediately after leaving the house, spoke with Beydoun, after which Beydoun was shot and killed. Further, at the scene of the crime, shells were retrieved that were consistent with shells found in an AK-47. Therefore, with the strength of this circumstantial evidence, Baker cannot show how any errors related the entire "slam dunk" conversations would have been outcome determinative. See *Lukity*, 460 Mich at 496.

## A. INVESTIGATIVE SUBPOENA TESTIMONY

In the course of her testimony, Welch repeatedly denied having any recollection of various events and denied recalling her earlier testimony given under the investigative subpoena. For example, at trial and contrary to her testimony pursuant to the investigative subpoena, she denied that she saw Baker holding a weapon when he arrived on the night at issue. Welch also contradicted testimony given under the investigative subpoena that Baker hit her when he arrived, testifying at trial that she did not "really recall it." She also said that she did not remember "a lot" of what she had previously testified to under oath. Welch even stated that she forgot that Baker "smacked" her and related that she was "just going" on what Harajle and Brown had told her what happened. The prosecutor then attempted to ask her about her earlier testimony, and Welch was evasive and repeatedly denied recalling. After Welch made it clear that she would continue to assert that she did not recall anything about her previous testimony, the prosecution moved to have her previous testimony read into the record under MRE 801(d)(1)(A).

On appeal, Baker maintains that the trial court erred when it applied MRE 801(d)(1)(A) because Welch's later testimony showed that she did in fact recall the events at issue and so her testimony was not inconsistent. At trial, however, defense counsel conceded that Welch claimed that she did not recall the events at issue or her previous testimony. And defense counsel affirmatively stated that Welch's previous testimony was admissible under MRE 801(d)(1)(A), but she argued that it should not be admitted until after counsel had an opportunity to cross-examine Welch. By agreeing that the transcript was admissible, at least to the extent that it was not hearsay under MRE 801(d)(1)(A), defense counsel waived, for purposes of MRE 801(d)(1)(A), any claim that the trial court erred when it determined that Welch's statements were inconsistent. See *People v Carter*, 462 Mich 206, 219-220; 612 NW2d 144 (2000). Accordingly, any error is extinguished, thereby precluding defendant from raising this issue on appeal. *Id.* at 209.

## B. FAILURE TO INVOKE MRE 612

Baker also argues on appeal that the trial court should have required the prosecutor, pursuant to MRC 612, to refresh Welch's recollection using the transcript of the earlier proceedings, rather than having Welch's testimony read into the record. Defense counsel did not argue that procedure before the trial court. Therefore, to the extent that he now argues that it was incumbent on the trial court to follow such a procedure, his claim is unpreserved for appellate review. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001).

However, Baker cites to no authority for the proposition that a party is required to attempt to refresh a witness's memory under MRE 612 before resorting to utilizing the witness's prior testimony. Indeed, we have found no authority. Thus, the prosecutor had no obligation to ensure that the admission of Welch's previous testimony met the requirements of MRE 612 before she could seek the admission of Welch's testimony consistent with the other rules of evidence. See *Yost*, 278 Mich App at 355 (recognizing that the fact that the rules of evidence preclude the use of evidence for one purpose does not render the evidence inadmissible for other purposes). Consequently, the trial court did not commit a plain or obvious error by failing to follow the procedure defendant advocates. See *Carines*, 460 Mich at 763.

## C. OBJECTIONS TO CONTENT OF TESTIMONY

Baker further argues on appeal that the trial court allowed the prosecutor to elicit improper other-acts testimony from Welch, contrary to MRE 404(b). Defense counsel either did not object to the testimony at issue or objected successfully, leading to the trial court striking the testimony. Thus, only those instances where defense counsel did not object are before us, and those claims are unpreserved. See *People v Danto*, 294 Mich App 596, 605; 822 NW2d 600 (2011). As such, the defendant bears the burden of showing that any error was plain and affected his substantial rights, and to meet this burden, the defendant must show that the error affected the outcome of the lower court proceedings. *Carines*, 460 Mich at 763.

Under MRE 404(b), evidence of other acts is generally inadmissible to prove character, or more specifically that a person has acted in conformity with that character. *Roper*, 286 Mich App at 91. At trial, Welch informed the jury that Baker had physically abused her in the past. For example, when the prosecutor asked whether Welch was afraid that Baker would find out about her statements to police officers, Welch responded, "Of course. Do you know how many domestic violences [sic] we've had?" In another instance, defense counsel asked about Welch's previous statement concerning a firearm, and Welch asked defense counsel if she knew how many "domestic violences" she has endured. During the reading of Welch's testimony under oath pursuant to an investigative subpoena, the jury also learned that Welch told officers that Baker had in the past "beat the f*** out of [her]." After a question by defense counsel, she volunteered that Baker and his family were "crazy." Finally, when the trial court read a jury question asking Welch how Baker knew the man that she claimed called Baker and told him to come to the house on the night at issue, she said, "[T]hrough the hood. Jail probably."[7]

Welch's statements were for the most part unresponsive, volunteered answers to otherwise proper questions, which were mostly by defense counsel. Unresponsive answers are generally not considered prejudicial unless egregious or not amenable to a curative instruction. See *People v Mahone*, 294 Mich App 208, 213; 816 NW2d 436 (2011). The unresponsive answers—although improper—were not particularly egregious or so prejudicial that they warrant reversal. The jury was well aware that Baker had a prior record as a result of the stipulation that he had been convicted of a felony and was not eligible to carry or possess a firearm during the events at issue. As such, even if Welch indicated that Baker had been in jail, the jury was well aware of that fact.

Additionally, the jury heard testimony that Baker came to the house where Welch was visiting with a semi-automatic rifle and slapped Welch. It also heard that Welch feared Baker. As such, Welch's unresponsive and volunteered testimony that Baker had in the past engaged in

---

[7] We note that the prosecution maintains that Welch likely said, "Jill," not "jail," despite what is reflected in the transcript. In support of its position, the prosecution notes that immediately after Welch makes this statement, the trial court asks, "Okay. Who is Jill? Do you know who Jill is?" And later, Welch describes Jill as "a white woman that hangs around the hood." Regardless, we will accept the transcript at face value.

additional incidents of domestic violence was not particularly noteworthy or prejudicial. Further, when defense counsel did specifically object, the trial court told Welch to limit her answer to the question asked, struck the unresponsive answer, and instructed the jury to disregard it. It is presumed that juries follow their instructions and that instructions cure most errors. *Abraham*, 256 Mich App at 279. Consequently, to the extent that the trial court erred—plainly or otherwise—by allowing Welch to testify that she had been the victim of domestic violence by Baker, that he and his family were crazy, and that he had been in jail in the past, those errors do not warrant any relief because on the strength of the untainted evidence, Baker has not shown that these errors were outcome determinative. See *Carines*, 460 Mich at 763; *Lukity*, 460 Mich at 495-496.

## V. DISCOVERY VIOLATION

Baker also challenges the trial court's decision to admit Call #7 at trial on the ground that the prosecutor improperly suppressed the evidence and that its admission violated due process.

The prosecution proposed admitting Call #7 after it was found by McDonald late on the sixth day of trial. While defense counsel objected to the admission of this call, at no point did defense counsel object to the admission of the recording of Call #7 on the ground that the prosecution improperly suppressed the evidence, or that the late disclosure violated due process. Therefore, Baker has not preserved this claim of error for appellate review. See *Aldrich*, 246 Mich App at 113.

This Court reviews de novo the proper interpretation and application of the rules of evidence. See *Duncan*, 494 Mich at 723. This Court also reviews de novo questions of constitutional law. See *People v Rose*, 289 Mich App 499, 505; 808 NW2d 301 (2010). However, this Court reviews unpreserved claims of constitutional error for plain error affecting the defendant's substantial rights. *Carines*, 460 Mich at 763.

On appeal, Baker suggests that the prosecutor committed a so-called *Brady*[8] violation by failing to disclose the existence of the call. But it is beyond reasonable dispute that Call #7 did not include evidence that was favorable to the accused. See *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014) (stating that to establish a *Brady* violation, the defendant must demonstrate that the prosecution suppressed evidence that was favorable to the accused). Baker also erroneously suggests that the prosecution can commit a *Brady* violation by suppressing inculpatory evidence. As our Supreme Court made clear in *Chenault*, however, to succeed on a *Brady* claim, a defendant must demonstrate, in part, that the suppressed evidence was favorable to the accused. *Id.* Consequently, the trial court cannot be faulted for failing to suppress Call #7 on its own initiative on the basis of a nonexistent *Brady* violation. See *Carines*, 460 Mich at 763.

Baker also argues that the late use of undisclosed evidence amounted to a violation of due process. Baker correctly notes that the United States Supreme Court has broadly stated that due

---

[8] See *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

process requires some level of mutual discovery during criminal trials. See *Wardius v Oregon*, 412 US 470, 475-476; 93 S Ct 2208; 37 L Ed 2d 82 (1973) ("The State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses. It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State."). However, Michigan's Court Rules provided Baker with the means to discovery. See MCR 6.201. And Michigan courts have the authority to fashion remedies for violations of those rules. See *Rose*, 289 Mich App at 525.

Baker nevertheless asserts that this Court must presume prejudice whenever a prosecutor provides inculpatory evidence at a late date, even if the failure to earlier disclose the evidence was inadvertent. However, some of the cases that he cites are too cursory to support that assertion. See *People v McPherson*, 419 Mich 951 (1984) and *People v Smith*, 419 Mich 918 (1984) (both cases reversing and remanding for a new trial on the basis of discovery violations without discussion of the proper test). And the remaining cases do not establish that this Court follows a rule of automatic reversal when the trial court allows admission of late disclosed inculpatory evidence.

This Court has stated that a prosecutor's violation of a discovery order requires reversal unless the failure to divulge was harmless beyond a reasonable doubt. See *People v Audison*, 126 Mich App 829, 834; 338 NW2d 235 (1983), citing *People v Pace*, 102 Mich App 522, 530-531; 302 NW2d 216 (1980). However, those decisions are not binding on this Court, see MCR 7.215(J)(1), and another panel of this Court specifically disavowed elevating a discovery violation to constitutional magnitude and imposing an automatic reversal requirement. See *People v Taylor*, 159 Mich App 468, 471; 406 NW2d 859 (1987) ("We disagree, not with the proposition that prosecutors ought to be bound by discovery orders or their own discovery agreements, but with the view that this procedural problem should be elevated to constitutional rank and locked into an inflexible remedy."). Thus, the pre-November 1, 1990 authorities were split on the proper procedure for handling discovery violations. Since the release of those nonbinding decisions, this Court has specifically stated that a trial court has the discretion to fashion an appropriate remedy for a discovery violation under the totality of the circumstances; it also stated that the objecting party had to demonstrate actual prejudice. See *Rose*, 289 Mich App at 525-526. This Court also emphasized that exclusion of evidence for a discovery violation was an extreme remedy that should not be employed when a different remedy will limit the prejudice occasioned by the discovery violation. *Id.* at 526.

Here, it is not evident that the prosecutor violated any discovery order at all. McDonald said that he received a new batch of recordings from the jail in the evening after the sixth day of trial. He then reviewed the recordings from 5:00 p.m. to 2:00 a.m. the next morning. When he discovered Call #7, he informed the prosecutor by text at around 9:45 p.m. that night and e-mailed the recording to the prosecutor and defense counsel. As such, it appears that the recording was provided to the defense as soon as practicable. See MCR 6.201(H) (requiring prompt disclosure of newly discovered evidence).

It is also difficult to see how the defense might have been prejudiced by the prosecution's failure to find the call earlier. Baker participated in the call, knew what he said, and knew that it

was being recorded. He also knew that McDonald had been reviewing the recordings of his calls as they became available. Accordingly, even assuming a discovery violation, Baker would not be entitled to any remedy because he already had actual notice of the call and knew its implications for his defense. See *Taylor*, 159 Mich App at 488 (stating that the defendant was not entitled to a remedy for the discovery violation because he knew about the letter, having written it, and so his knowledge was not dependent on discovery).

On this record, the trial court did not plainly err when it failed to sua sponte resort to the most extreme sanction available and exclude Call #7 as a remedy for a purported discovery violation. See *Carines*, 460 Mich at 763.

## VI. EVIDENCE OF THREATS

Finally, Baker complains that the trial court should not have allowed the evidence concerning threats against witnesses because there was no evidence that he communicated the threats to the witnesses or had any connection to any threats that might have been made to the witnesses by third parties. Because Baker did not raise these claims of error before the trial court, they claims are all unpreserved. See *Danto*, 294 Mich App at 605. As such, our review is limited to plain error affecting Baker's substantial rights. See *Carines*, 460 Mich at 763.

Our Supreme Court has never limited the admissibility of a defendant's threat to harm a witness to instances where the evidence showed that the defendant conveyed the threat to the witness, instructed a third-party to convey the threat to the witness, or actually conspired to carry out the threat against a witness. Indeed, in *Sholl*, a third-party did in fact tell the complainant about the defendant's threats, although there was no evidence that the defendant caused the third-party to convey the threat. See *Sholl*, 453 Mich at 739. Nevertheless, our Supreme Court held that the evidence of the threat was admissible to show that the defendant was conscious of his guilt because merely making the threat was conduct that could give rise to such an inference. *Id.* at 740. For this reason, the recordings of the calls from jail were not inadmissible on the ground that there was no evidence that anyone actually conveyed the threats to the witnesses or carried out the threats on Baker's behalf. Indeed, the jail calls did not even pertain to "threats"; instead, they showed Baker's intent to silence the witnesses, which reflected his consciousness of guilt.

Regarding Welch's testimony, Baker claims that Welch should not have been allowed to testify that Baker's family members threatened her because the jury was left to infer that he induced his family members to threaten Welch. We agree that our Supreme Court has held that a threat by a third-party is not evidence that the defendant was conscious of his guilt absent some connection between the threat by the third-party and the defendant. See *People v Long*, 144 Mich 585, 585-586; 108 NW 91 (1906). However, the prosecutor in this case did not present any evidence that a third-party threatened any witnesses. At trial, the prosecutor asked Welch if she had spoken to any of Baker's family members during or before trial. She agreed that she had spoken with some of his family members and stated that "they weren't mean or anything, but they were looking at me crazy." She also indicated that they were interested in what her testimony would be. She did relate that an unknown black woman sitting in the back, who had just left the courtroom, was "freaking" her out. Welch also said that her earlier testimony was inaccurate because she was trying to protect herself. She stated that Baker's family was "pretty crazy as [was] he." After defense counsel objected, the court struck the statement about Baker

and his family.  As can be seen, Welch did not testify that she had actually been threatened by anyone.  She did express general fears for her safety, but her statements were not solicited by the prosecution and were not offered as evidence against Baker.  Further, as the trial court demonstrated when it struck Welch's testimony about Baker's family, the trial court was ready and willing to strike unresponsive testimony and instruct the jury in a way that could have cured any error occasioned by Welch's offhand remarks.  See *Abraham*, 256 Mich App at 279.

Therefore, on this record, we conclude that Baker has not shown that the trial court plainly erred by allowing the admission of any improper threat evidence against him or that any error prejudiced his trial.  See *Carines*, 460 Mich at 763.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Jonathan Tukel
/s/ Anica Letica