*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DELANO DESHAWN CUMMINGS,

Defendant-Appellant.

UNPUBLISHED
October 14, 2025
10:05 AM

No. 361371
Genesee Circuit Court
LC No. 19-045841-FC

Before: GADOLA, C.J., and MURRAY and YATES, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of second-degree murder, MCL 750.317, possession of a firearm by a person convicted of a felony (felon-in-possession), MCL 750.224f, and two counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced, as a third-offense habitual offender, MCL 769.11, to 30 to 60 years' imprisonment for the second-degree murder conviction, 2 to 10 years' imprisonment for the felon-in-possession conviction, and two years' imprisonment for each felony-firearm conviction. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The victim was shot and killed in the parking lot of an after-hours club called Club What's Next. The victim and her boyfriend, Cortez Williams, met the victim's sister, Trenicia Miles (Miles), and Miles's significant other, Otis McFadden, to celebrate Williams's birthday. Before attempting to enter the club, Williams, McFadden, Miles, and the victim smoked marijuana and drank alcohol.

The victim and Miles were denied entry to the club. While still in the parking lot, another woman, Ganasha Bruce, began arguing with the victim. Williams and Bruce's boyfriend, Linsell Ravest, became involved in the altercation. Then, defendant appeared from inside or behind a vehicle, pointing a black gun at the group of people, and began shooting. At trial, Miles and McFadden both identified defendant as the shooter. Miles testified that defendant had gold teeth, dreadlocks, and a tattoo under his eye. He was wearing a red "hoodie" sweatshirt or a red jacket. Chacolend Dye, another victim who was shot in the leg, told the police that the shooter was "a tall,

-1-

dark-skinned black male with long dreads," and was "6'2", 170 pounds." Dye died about a year after the incident for unrelated reasons.

Miles fled the area of the shooting, but the victim fell to the ground. Miles heard about 30 gunshots coming from multiple guns and directions while she was hiding. When the shooting stopped, Miles saw that the victim was lying on her back and appeared unconscious. The group put the victim in Williams's car and drove to the hospital. While traveling, Williams lost control of the car, which rolled a few times and hit a tree. The victim was ejected from the car, was pronounced dead at the hospital, and a later autopsy determined that she died from the gunshot wounds.

Meanwhile, McFadden and Miles remained at the scene of the automobile accident. Flint Township Police Detective-Sergeant Brett Cassidy arrived to investigate the automobile accident and spoke with McFadden and Miles. Miles was visibly upset. According to Detective-Sergeant Cassidy, Miles said that the shooter was "[a] black male who had possibly a dark complexion." According to Miles, she told Detective-Sergeant Cassidy that the shooter "was brown-skinned, that he had shoulder length dreads, [and] that I wasn't sure if it was in a ponytail or if it was hanging down." Surveillance footage from Club What's Next depicted the shooting, but was too grainy to identify the face of the shooter. The footage also showed a dark gray (or charcoal) Dodge Charger with unique wheel rims leaving Club What's Next shortly after the shooting.

A couple of days after the incident Taylor Mayberry showed Miles defendant's Facebook profile page, which contained photos of defendant. Mayberry told Miles that "word had gotten out" that defendant was the shooter. The police investigated the shooting by reviewing the surveillance footage and conducting a ballistics investigation. Flint Township Police Detective Lacey Lopez, the officer in charge of the case, received a variety of calls describing the shooter. She received two anonymous Crime Stoppers tips, both identifying defendant as the shooter. Police then executed a search warrant at defendant's apartment, where they found a red hoodie sweatshirt and a nine-millimeter handgun magazine. Later, the police found a Dodge Charger registered to defendant, and matching the description of the vehicle shown in the surveillance footage, in the garage of an "associate" of defendant's brother.

Miles and McFadden both identified defendant in the photographic lineup. They denied at trial that they spoke with one another before the lineups about Mayberry's conversation with Miles. During his interview, defendant told the police that he was at the Chips Club and a Super 8 motel with a woman named Shay on the night of the incident. He denied ever going to Club What's Next.

A .38-caliber class bullet was found in the victim's body, which Michigan State Police Detective-Sergeant Grel Rousseau believed "more likely than not" came from a nine-millimeter gun. Sergeant Rousseau's team found casings from a nine-millimeter gun near the "club side" of the parking lot, which was most likely where the gun was fired and was near where Miles and McFadden saw defendant right before the shooting.

As part of the investigation, Michigan State Police Detective-Sergeant Randy Khan reviewed about three months' worth of records for a cell phone number registered to defendant. On the night of the incident, that cell phone made connections with cell phone towers near the

scene of the shooting. Based on his investigation, Sergeant Khan testified that, in his opinion "the same person was using this phone over the entire three month period, and in my opinion is [sic] it's Delano Cummings [who] was using that cell phone during this time period and during the time of the incident." He based his opinion on the fact that the phone was registered to defendant, the phone's communications were with numbers registered to defendant's relatives and friends, and the cell phone was often used near defendant's apartment.

During his closing argument, defendant's counsel conceded that defendant was at Club What's Next during the incident, but denied that he was the shooter. Defendant was convicted and sentenced as noted earlier. He then moved for resentencing, as well as for a new trial or a *Ginther*[1] hearing on his ineffective assistance of counsel argument. The trial court denied the motion for resentencing, and rejected each assertion of ineffective assistance of counsel, concluding that trial counsel employed sound legal strategies that did not prejudice the defense.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

A defendant preserves the issue of ineffective assistance of counsel by moving in the trial court for a new trial or a *Ginther* hearing, *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012), or by moving this Court to remand for a *Ginther* hearing, *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Defendant preserved most of his ineffective-assistance arguments by moving the trial court for a new trial or a *Ginther* hearing, and by moving this Court to remand the case to the trial court for a *Ginther* hearing. The ineffective assistance arguments he raised in those motions are largely incorporated in defendant's brief on appeal and his supplemental brief on appeal.

However, defendant raises several issues of ineffective assistance of counsel for the first time on appeal that he did not include in his motions. He argues trial counsel should have requested the missing-witness jury instruction, M Crim JI 5.12, in relation to Williams. He did not mention Williams in his motions, and his argument on this point was limited to witness Andre Dye. Defendant also raises several issues of ineffective assistance in his Standard 4 brief that he did not raise in the trial court, including whether trial counsel failed to request certain jury instructions and to object to alleged instances of prosecutorial misconduct. Therefore, these issues are unpreserved.

Issues of ineffective assistance of counsel involve a mixed question of fact and constitutional law. *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021). We review the trial court's findings of fact for clear error, and the legal questions de novo. *Id*. Clear error occurs when this Court is left with a definite and firm conviction that a mistake was made. *Id*. When the trial court declines to conduct a *Ginther* hearing, we review de novo the entire record to determine whether trial counsel's representation was ineffective. *People v Rose*, 289 Mich App 499, 524; 808 NW2d 301 (2010).

Criminal defendants have the right to the effective assistance of counsel under the United States Constitution and the Michigan Constitution of 1963. *People v Yeager*, 511 Mich 478, 488;

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

999 NW2d 490 (2023). To establish ineffective assistance of counsel entitling the defendant to a new trial, " 'a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that that outcome would have been different.' " *Id*. (citation omitted). A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citations omitted). On the issue of deficient performance, attorneys have broad latitude when determining trial strategy, and there is a strong presumption that counsel's performance was part of that strategy. *Id*. "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver (On Remand)*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019) (quotation marks and citation omitted). "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## A. FAILURE TO INVESTIGATE

Trial counsel's failure to investigate the case constitutes ineffective assistance of counsel if it undermines confidence in the outcome of the trial. *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). The only specific area where defendant argues counsel failed to investigate the case is in relation to his alibi defense. In his affidavit submitted in the trial court, defendant stated that he never told trial counsel he was at Club What's Next during the incident. However, defendant does not explain what additional steps counsel should have taken to investigate the alibi defense beyond speaking with defendant and discussing the strategy with him. Under the circumstances, defendant has not established a deficient performance.

Regarding prejudice, defendant does not outline how further investigation would have uncovered additional evidence supporting his alibi defense. Defendant told Detective Lopez he was with a woman named Shay during the incident. Defendant does not argue or provide an offer of proof that Shay (or any other alibi witness) would have testified favorably at trial. See *People v Pickens*, 446 Mich 298, 327; 521 NW2d 797 (1994) (explaining that the defendant must establish that an alibi witness would have testified favorably at trial). Defendant does not point to any additional evidence that trial counsel would have uncovered to overcome the overwhelming evidence that he was at Club What's Next. Thus, defendant has not demonstrated that counsel's alleged failure to investigate undermined confidence in the trial's outcome.

## B. CLOSING-ARGUMENT STATEMENTS

Counsel's decision to concede during his closing argument that defendant was at Club What's Next on the night of the incident was reasonable trial strategy. A decision regarding what evidence to highlight during closing arguments is presumed to be a matter of trial strategy. *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015).

Throughout trial, trial counsel attempted to undermine the credibility of the prosecution's witnesses on the issue of identification. Counsel vigorously cross-examined Miles, McFadden, and the police officers regarding the description of the shooter. He suggested in his questioning that the photographic lineups may have been suggestive because defendant was the only individual who had a facial tattoo. He questioned the officers on why the police failed to investigate another Dodge Charger that was depicted on surveillance footage from a nearby McDonald's restaurant.

He also raised questions during cross-examination about whether the police adequately investigated other potential suspects, such as Ravest. During cross-examination, trial counsel elicited testimony from Sergeant Khan that the cell phone he analyzed may have been near Club What's Next, without necessarily being at Club What's Next.

Despite these efforts, both Miles and McFadden testified that they saw defendant at Club What's Next and identified him as the shooter. They both selected defendant from a photographic lineup, and two anonymous individuals using Crime Stoppers also identified defendant as the shooter. Chacolend Dye's description of the shooter matched defendant's physical description. Defendant owned a charcoal gray Dodge Charger with unique wheel rims, and a vehicle matching that description was at the murder scene. Sergeant Khan testified that a cell phone registered to defendant and used often near defendant's apartment was within approximately 1 mile from Club What's Next during the incident. Detective Alexander Minto provided detailed testimony about the surveillance footage, which showed a man matching defendant's description and wearing a red jacket like one found in defendant's apartment at the scene.

Considering this overwhelming evidence that defendant was at Club What's Next and was the shooter, it was reasonable trial strategy for trial counsel to acknowledge that defendant was present at Club What's Next and lied to police out of fear of racial or socioeconomic bias. See *People v Wise*, 134 Mich App 82, 98; 351 NW2d 255 (1984) ("Where defense counsel in opening statement recognizes and candidly asserts the inevitable, he is often serving his client's interests best by bringing out the damaging information and thus lessening the impact."). Doing so diminished the weight of the evidence tying defendant to Club What's Next, such as the cell phone records and testimony about his unique vehicle. Admitting defendant was at Club What's Next also explained why McFadden and Miles may have seen defendant in the parking lot and confused defendant for the shooter. Therefore, defendant has not overcome the strong presumption that trial counsel employed a reasonable trial strategy. See *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004) ("A particular strategy does not constitute ineffective assistance of counsel simply because it does not work.").

There also exists no reasonable probability that, even if counsel had not conceded defendant was at the crime scene, the outcome would have been different. As outlined earlier, there was abundant evidence that defendant was at Club What's Next and was the shooter. The trial court instructed the jury following closing arguments that the lawyer's statements and arguments are not evidence. The jury was free to reject counsel's statement and accept defendant's alibi from his police interview, if the jury concluded that the evidence supported the alibi defense. See *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011).

## C. CROSS-EXAMINATION

Next, defendant argues that his trial counsel was ineffective for failing to cross-examine Detective-Sergeant Cassidy on the discrepancy between Miles's preliminary-examination testimony that she told the police the perpetrator was " 'brown-skinned,' " and Detective-Sergeant Cassidy's trial testimony that Miles told him the shooter " ' had possibly a dark complexion.' "

"[D]ecisions regarding how to question a witness and conduct cross-examination is a matter of trial strategy." *People v Thurmond*, 348 Mich App 715, 743; 20 NW3d 311 (2023).

During the preliminary examination, Miles testified that she told police on the night of the incident that the shooter was "brown-skinned." At trial, Detective-Sergeant Cassidy testified that Miles told him the shooter was "[a] black male who had possibly a dark complexion." At trial, Miles reaffirmed that she told Detective-Sergeant Cassidy that the shooter had a brown skin tone. She testified that the shooter "was brown-skinned, that he had shoulder length dreads, [and] that I wasn't sure if it was in a ponytail or if it was hanging down." The jury was able to hear Miles's testimony and Detective-Sergeant Cassidy's testimony and determine whether the difference was material.

Defendant argues that Detective-Sergeant Cassidy made a false statement about Miles's description of the shooter to make the identification stronger, but he has not provided any evidence that Detective-Sergeant Cassidy fabricated his testimony. Moreover, as the trial court recognized, the distinction between whether defendant had brown skin or a dark complexion was not pivotal. Miles and Detective-Sergeant Cassidy agreed that Miles gave only a vague description on the night of the incident and that she was distraught at the time. Most importantly, trial counsel elicited testimony from Detective-Sergeant Cassidy that Miles did not describe the shooter as having long dreadlocks, a facial tattoo, or gold teeth, which supported the defense theory that Miles's more descriptive trial testimony on the shooter's appearance was influenced by her conversation with Mayberry. Counsel's decision not to further highlight the difference between whether defendant was "brown-skinned" or had "possibly a dark complexion" was a matter of trial strategy. Defendant does not establish a reasonable probability that further cross-examination on this issue would have changed the outcome, or that further factual development on this issue would advance his position.

## D. FAILURE TO CALL MAYBERRY AS A WITNESS

Defendant next argues that trial counsel was ineffective for failing to call Mayberry as a witness at trial. Generally, "[d]ecisions regarding whether to call or question witnesses are presumed to be matters of trial strategy." *Russell*, 297 Mich App at 716.

Defendant has not overcome the presumption that counsel's decision not to call Mayberry as a witness at trial was a matter of trial strategy. Trial counsel explored Mayberry's role in the case and developed a theory that Mayberry's statements influenced Miles's identification of defendant as the shooter. Mayberry was not present at the scene of the incident and could not provide eyewitness testimony, and her testimony about the statements that other individuals made to her would most likely be inadmissible hearsay. See MRE 801; MRE 802. Trial counsel's decision against calling Mayberry was sound trial strategy.

Even assuming Mayberry had provided favorable trial testimony, as already recounted, there was significant eyewitness testimony placing defendant at the scene of the incident and identifying him as the shooter. In the face of that evidence, trial counsel thoroughly cross-examined Miles about the fact that Mayberry told her defendant was the shooter and showed Miles defendant's Facebook photographs shortly before Miles identified defendant in a photographic lineup. During closing argument, he reminded the jury about Mayberry's role in the case and argued the police should have interviewed Mayberry. So, the jury heard testimony and argument supporting defendant's theory that Miles identified defendant as the shooter based on false

information from Mayberry. Under the circumstances, no reasonable probability exists that the outcome would have been different had Mayberry testified.

## E. SPEEDY TRIAL

Defendant also argues that trial counsel rendered ineffective assistance by failing to move to dismiss the case for violation of his right to a speedy trial. The United States Constitution and the Michigan Constitution of 1963 both guarantee a criminal defendant the right to a speedy trial. US Const, Am VI; Const 1963, art 1, § 20. See *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006).

To determine whether a defendant's constitutional right to a speedy trial has been violated, this Court will balance four factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Williams*, 475 Mich at 261-262. If the delay before trial is 18 months or more, then the court presumes prejudice, and the burden shifts to the prosecution to show that there was no injury to the defendant. *Id*. at 262. When this is the case, "a 'presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial.' " *Id*. (citation omitted). Here, there is no dispute that 32 months elapsed between defendant's arrest and the trial, so the delay was presumptively prejudicial.

As for the reason for the delay, this Court will examine whether each period of the delay can be attributed to defendant or the prosecution. *People v Waclawski*, 286 Mich App 634, 666; 780 NW2d 321 (2009). "Although delays inherent in the court system, e.g., docket congestion, are technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *Williams*, 475 Mich at 263 (quotation marks and citation omitted). This Court recently held that delays attributable to the COVID-19 pandemic are not attributable to the prosecution. *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 5. Unexplained delays and scheduling delays are attributed to the prosecution. *Waclawski*, 286 Mich App at 666. The delay caused by the withdrawal of defense counsel cannot be attributed to the prosecution. See *People v Collins*, 388 Mich 680, 691; 202 NW2d 769 (1972).

The orders issued by the Michigan Supreme Court during the pandemic collectively prevented the trial court from conducting most jury trials for most of 2020 and part of 2021. See *Smith*, ___ Mich App at ___; slip op at 4. The record supports that the COVID-19 pandemic caused most of the delay in this case, while the withdrawal of two defense attorneys, plea negotiations, and a fire at the courthouse caused the remaining delay. Because none of these delays can be attributed to the prosecution, the reasons for the delay do not support defendant's speedy-trial claim.

With respect to defendant's assertion of the right, he argues that counsel should have moved to dismiss the case for a speedy-trial violation. Defendant attempted to raise the issue himself in an ex parte request for a speedy trial, which the court refused to consider on an ex parte basis. If counsel had raised the issue on defendant's behalf at trial, then this factor would have also weighed in defendant's favor.

The final factor is prejudice. There are two types of prejudice: prejudice to the defendant's person and prejudice to the defense of the case. *Williams*, 475 Mich at 264. Impairment of the defense is a more serious form of prejudice in these cases " 'because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.' " *Smith*, ___ Mich App at ___; slip op at 6 (citation omitted). The prejudice is obvious when a witness dies or disappears during the delay. *Id*. at ___; slip op at 6.

As noted, prejudice is presumed because of the lengthy delay between defendant's arrest and the trial. There is little doubt that defendant suffered a considerable personal deprivation because of his incarceration for about three years during the peak of the COVID-19 pandemic. However, the "[m]ost important" factor is the prejudice to the defense of the case. See *id*. at ___; slip op at 6. Defendant experienced some prejudice because of the delay. One witness, Chacolend Dye, died during the period of delay. Chacolend Dye saw the shooter and provided the police with a description matching defendant's description. Defense counsel could not cross-examine Chacolend Dye regarding his credibility. Likewise, Williams initially cooperated with the police, saw the shooter, and described him to the police. But he disappeared during the delay. Defendant could not cross-examine Williams about his observation. However, the prejudice was minimal because there were other eyewitnesses to the shooting (Miles and McFadden), and those witnesses identified defendant as the shooter at trial and in photographic lineups. The statements of Chacolend Dye and Williams merely corroborated the testimony of Miles and McFadden, and neither were favorable witnesses for defendant.

In consideration of these factors, the record supports that the prosecution brought this case to trial as soon as possible after trials resumed following the COVID-19 emergency period. While defendant experienced personal prejudice and some prejudice to his defense because of the delay, as the trial court concluded, the reasons for the delay outweighed the minimal prejudice to the defense. A motion to dismiss based on a speedy-trial violation would have been futile. See *Ericksen*, 288 Mich App at 201.

## F. MISSING-WITNESS INSTRUCTION

Next, defendant argues that trial counsel was ineffective for failing to request the missing-witness jury instruction in relation to Andre Dye and Williams. See MCL 767.40a(3) and (4).

"A prosecutor who endorses a witness under MCL 767.40a(3) is obliged to exercise due diligence to produce that witness at trial." *People v Eccles*, 260 Mich App 379, 388; 677 NW2d 76 (2004). When the prosecution fails to produce an endorsed witness, the prosecution may show that they could not produce the witness despite exercising due diligence. *Id*. "If the trial court finds a lack of due diligence, the jury should be instructed that it may infer that the missing witness's testimony would have been unfavorable to the prosecution's case." *Id*. at 388-389. Due diligence is the attempt to do everything reasonable to obtain the presence of the witness, and does not require that the prosecutor do everything possible to obtain that witness's presence. *Id*. at 391.

Williams and Andre Dye were endorsed witnesses. Regarding Andre Dye, during a March 4, 2022 trial proceeding, the prosecutor explained that Andre Dye's testimony could expose him to a charge of felon-in-possession. Outside the presence of the jury, the prosecutor questioned Andre Dye, who invoked his right to be protected against self-incrimination at several points

-8-

during his testimony. Because of that, the prosecutor explained that he would not call him as a witness.

By the third day of trial testimony, the prosecution secured immunity documents for Andre Dye, but Andre Dye did not appear for that day of trial. The prosecution served Andre Dye with a subpoena to testify, and he appeared for several days of trial. A detective reminded Andre Dye of his ongoing obligation to appear for trial, and the prosecutor spoke with Andre Dye's counsel when he failed to appear. Under these circumstances, the prosecution exercised due diligence in attempting to secure Andre Dye's trial testimony. Therefore, trial counsel did not render ineffective assistance by failing to make a meritless request for a missing-witness instruction. See *Ericksen*, 288 Mich App at 201.

Nor can defendant establish a reasonable probability that, had the jury heard the missing-witness instruction, the outcome would have been different. Defendant argues that Andre Dye was a potential suspect in the crime because he had a gun at the scene of the shooting, and was granted immunity. But it is unknown whether Andre Dye saw the shooter or knew his identity, and there was no evidence at trial that Andre Dye shot the victim. So, the missing-witness instruction would not have led the jury to reasonably believe Andre Dye was the shooter. Moreover, as noted earlier, ample evidence supported that defendant was the shooter. Defendant cannot show a reasonable probability that the outcome would have been different.

As for Williams, Detective Lopez testified that she made a thorough attempt to find Williams before trial, although she did not specify what specific steps she took to find him. Although the record is limited, this evidence was enough to establish the prosecution exercised due diligence to locate Williams and produce him at trial. More importantly, a reasonable probability does not exist that providing the missing-witness instruction for Williams's testimony would have changed the outcome considering that both Miles and McFadden identified defendant as the shooter. Williams's police statements merely corroborated their testimony. The only evidence tying Williams to the shooting was the initial 911 dispatch call suggesting that the shooter was in a black Chrysler 300, which was Williams's vehicle. Detective Lopez testified she ruled out the Chrysler 300 as the suspect's vehicle based on the videotape footage, ballistics evidence, and the witness statements. Under the circumstances, requesting a missing-witness instruction would have been futile. See *Ericksen*, 288 Mich App at 201.

## G. EXPERT TESTIMONY

Defendant also argues trial counsel should have objected to Sergeant Khan's testimony that defendant was using the cell phone in question on the night of the incident. MRE 702 governs the admission of expert testimony, and requires that the trial court ensure that the expert testimony is reliable, i.e., " 'whether the opinion is rationally derived from a sound foundation.' " *People v Bowden*, 344 Mich App 171, 187; 999 NW2d 80 (2022) (citation omitted).

Sergeant Khan testified as an expert in cellular technology, mapping, plotting geolocations, and analysis of call records. Trial counsel did not object to his expert testimony, stating simply, "He's an expert." After explaining the methods he employs in his analysis and discussing the three-month history of the cell phone records, Sergeant Khan testified in detail about the patterns of cell phone usage for the phone in question over a three-month period before the shooting. He

explained, based on the location of the cell towers interacting with the cell phone, that the cell phone (registered to defendant) was used often near defendant's apartment. The user made four outgoing calls on the night of the incident to four out of the user's top six contacts over the previous three months, which strongly suggested that the phone was not stolen. Based on this testimony, Sergeant Khan's opinion was based on sufficient facts and data, was the product of reliable principles and methods, and was the reflection of an application of the principles and methods to the facts of the case. See MRE 702. An objection would have been futile. See *Ericksen*, 288 Mich App at 201.

Defendant also suggests that trial counsel should have consulted with a rebuttal expert. "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). Additionally, "[w]ithout some indication that a witness would have testified favorably, a defendant cannot establish that counsel's failure to call the witness would have affected the outcome of his or her trial." *People v Carll*, 322 Mich App 690, 703; 915 NW2d 387 (2018). Defendant does not overcome the presumption that his counsel's decision against calling a rebuttal expert witness at trial was a matter of trial strategy, as he does not offer evidence that counsel could have secured a favorable rebuttal expert. Therefore, defendant has not established a factual predicate supporting a remand for a *Ginther* hearing on the subject.

## H. STIPULATION TO RETURN CHARGER

In his supplemental brief on appeal, defendant argues that counsel was ineffective for failing to inform the jury that the prosecution stipulated to release the Dodge Charger to his family before trial. Again, we disagree.

Defense counsel's decision not to raise the issue of the prosecution's stipulation to return the Charger was one of sound professional judgment and did not fall below an objective standard of reasonableness. First, by stipulating to release the vehicle, the prosecutor did not admit that the Charger was unconnected with the shooting. Rather, the prosecutor acknowledged during a pretrial hearing that if the police were finished with the investigation of the Charger, then "there's no reason for us to have that vehicle—or for the police to have that vehicle." See MCL 780.655(2).[2] At a subsequent pretrial hearing the prosecutor explained that "the People would be willing to stipulate so long as the investigation processing of the vehicle was complete." The prosecutor's statements reveal that the stipulation and return of the vehicle occurred because the police had no further evidentiary need for the vehicle—not because the prosecution agreed that no connection existed between the Charger and the crime. Also, the signed stipulation contains no factual admissions about the Charger. Any argument by counsel that the prosecutor admitted the

---

[2] MCL 780.655(2) provides, in relevant part, "The property and things that were seized shall be safely kept by the officer so long as necessary for the purpose of being produced or used as evidence in any trial."

Charger was not connected to the crime would have been meritless, and counsel was not ineffective for failing to raise the argument. See *Ericksen*, 288 Mich App at 201.[3]

Additionally, and for reasons already explained, no reasonable probability exists that even if the jury were informed of this fact, the result of the proceeding would have been different. There was ample evidence tying defendant to the shooting, and the Dodge Charger was only one piece of that evidence. [4]

## I. STANDARD 4 BRIEF

Finally, defendant raises a few additional ineffective assistance arguments in his Standard 4 brief. He argues, without further explanation, that trial counsel failed to request the proper jury instructions. " 'An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims . . . .' " *People v Konopka (On Remand)*, 309 Mich App 345, 366; 869 NW2d 651 (2015) (citation omitted). To the extent that defendant is referring to a jury instruction on self-defense, the request would have been futile. See *Ericksen*, 288 Mich App at 201.

Defendant further argues that trial counsel should have objected to instances of prosecutorial misconduct. As discussed later, the prosecution did not commit misconduct, so any objection would have been futile. See *Ericksen*, 288 Mich App at 201. Defendant also argues that counsel should have objected to Detective Minto's testimony identifying defendant in the video footage. But once again, this objection would have been meritless because Detective Minto did not identify defendant in the surveillance footage. He identified someone on the videotape recording that matched the description of the suspect. Therefore, defendant's Standard 4 brief does not establish ineffective assistance of counsel or that remand for a *Ginther* hearing is appropriate.

## III. OV 9

Defendant next argues that the trial court erred by assessing 25 points for OV 9 because there was no evidence that anyone other than the victim was placed in danger of physical injury or death.

---

[3] Because the prosecutor's pretrial opinion about whether the Charger should be returned to defendant was not evidence, any request to admit his pretrial statements would have been denied. See *People v Meissner*, 294 Mich App 438, 457; 812 NW2d 37 (2011). Likewise, the stipulation to return the vehicle was of limited probative value and would not have supported materially the defense of the case. See MRE 401 and 402.

[4] We note that remand for a *Ginther* hearing is not warranted because defendant has not offered any additional facts that would support the need for further development of the factual record, and the record is sufficient to make our determination. *People v Williams*, 275 Mich App 194, 200; 737 NW2d 797 (2007).

We review the trial court's findings regarding an assessment of points under the sentencing guidelines for clear error, and a preponderance of the evidence must support the factual findings. *People v Baskerville*, 333 Mich App 276, 291; 963 NW2d 620 (2020). OV 9 examines the number of victims. MCL 777.39. The court should assess 25 points for OV 9 when "[t]here were 10 or more victims who were placed in danger of physical injury or death, or 20 or more victims who were placed in danger of property loss." MCL 777.39(1)(b). The court must "[c]ount each person who was placed in danger of physical injury or loss of life or property as a victim." MCL 777.39(2)(a). " 'A person may be a victim under OV 9 even if he or she did not suffer actual harm; a close proximity to a physically threatening situation may suffice to count the person as a victim.' " *People v Teike*, 348 Mich App 520, 528; 19 NW3d 733 (2023) (citation omitted).

A preponderance of the evidence supported the trial court's finding that 10 or more people were in danger of physical injury or death during the incident. Miles testified at trial that the group involved in the altercation before the shooting involved about 20 people, and that she saw defendant pointing a gun at the crowd. Miles heard a total of about 30 gunshots from multiple directions and multiple guns. McFadden confirmed that he arrived at Club What's Next with about 15 to 20 people, though he only recalled Miles, Williams, and the victim being near him when defendant started shooting. He saw defendant pointing a gun "right at all of us," and then heard multiple gunshots. The videotape footage also shows a crowd of people involved in an altercation before the shooting. The ballistics evidence also supports that defendant shot multiple rounds into the crowd, as 11 casings from a nine-millimeter gun were found at the scene.

For these reasons, a preponderance of the evidence supported the assessment of 25 points for OV 9 because 10 or more individuals were placed in danger of death or physical injury.

## IV. BINDOVER

In his Standard 4 brief, defendant argues that the district court abused its discretion by binding him over for trial on the charged offenses because there was insufficient evidence to establish probable cause regarding his identity as the shooter. We conclude that any error was harmless. Defendant was tried and convicted of the lesser included offense of second-degree murder, as well as the charged offenses of felon-in-possession and felony-firearm, in a trial that we conclude was otherwise fair. See *People v Bennett*, 290 Mich App 465, 481; 802 NW2d 627 (2010) (noting that "the presentation of sufficient evidence to convict at trial renders any erroneous bindover decision harmless"). The district court bound defendant over on several charges, including first-degree premeditated murder. First-degree murder includes the elements of second-degree murder plus an additional element (in this case, premeditation). See *People v Carter*, 395 Mich 434, 437-438; 236 NW2d 500 (1975). Defendant is not challenging the district court's finding of probable cause regarding the additional element of premeditation. By convicting defendant of second-degree murder, the jury found beyond a reasonable doubt that defendant was the shooter. Because the jury ultimately convicted defendant of the lesser included offense of second-degree murder and the other charged offenses, any error in the bindover decision was harmless.

## V. PROSECUTORIAL MISCONDUCT

-12-

Defendant next argues in his Standard 4 brief that the prosecution engaged in misconduct by exploiting unreliable or false evidence at trial.

Issues of prosecutorial misconduct are preserved when the defendant makes a contemporaneous objection and requests a curative instruction. *People v Serges*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 355554); slip op at 16. There is no dispute that defendant did not make a contemporaneous objection to any of the alleged instances of prosecutorial misconduct and did not request a curative instruction. Nor do we conclude that a miscarriage of justice would result from the failure to review the issue. Therefore, the issue is unpreserved.

We review unpreserved arguments of prosecutorial misconduct for plain error affecting the defendant's substantial rights. *Serges*, ___ Mich App at ___; slip op at 15. " 'To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights.' " *Id*. at ___; slip op at 15, quoting *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "To establish that a defendant's substantial rights were affected, there must be 'a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings.' " *Serges*, ___ Mich App at ___; slip op at 15, quoting *Carines*, 460 Mich at 763. " 'Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence.' " *Serges*, ___ Mich App at ___; slip op at 15, quoting *Carines*, 460 Mich at 763.

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). The prosecutor generally has great latitude in relation to their arguments and conduct, and may argue the evidence and reasonable inferences arising from the evidence in support of the prosecution's theory of the case. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995).

The first issue is whether the prosecutor improperly relied on Miles's identification of defendant as the shooter. Defendant points out that Miles had consumed alcohol and smoked marijuana before the incident, and that Mayberry may have influenced her identification of defendant as the shooter by showing her defendant's Facebook profile. However, issues of witness credibility are within the role of the jury to decide. *People v Lemmon*, 456 Mich 625, 637; 576 NW2d 129 (1998). Defendant argues that the prosecution had a duty to determine whether Miles's identification of defendant was impermissibly suggestive, but cites no binding caselaw in support of this assertion. Furthermore, Miles's identification of defendant as the shooter was supported by McFadden's identification, two Crime Stoppers tips, Chacolend Dye's description of the shooter, the surveillance footage showing a car matching the description of defendant's car at the scene during the incident, the evidence found at defendant's apartment, and Sergeant Khan's analysis of the cell phone records. The court also instructed the jury in detail about how to determine whether an identification is reliable, and the jury is presumed to have followed that instruction. See *Mahone*, 294 Mich App at 212. Defendant cannot establish that plain error occurred or that the alleged error affected the outcome of the trial.

The second issue is whether the prosecution improperly introduced evidence of a red hoodie sweatshirt found in defendant's apartment. Defendant suggests that the prosecution should have performed DNA testing or testing for gunpowder residue to determine whether the sweatshirt was defendant's sweatshirt and whether it was involved in the incident. Otherwise, he argues that the jury could "make inferences based upon inferences" about whether the sweatshirt was owned by defendant and involved in the incident.

Circumstantial evidence and reasonable inferences arising from the circumstancial evidence may constitute proof of the elements of a crime. *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018). In *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002), the Court held that "if evidence is relevant and admissible, it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *Hardiman*, 466 Mich at 428. Therefore, the fact that the jury was required to make one or more inferences to connect defendant and the crime with the evidence found at his apartment was legally permissible.

The prosecution did not engage in misconduct by failing to conduct testing on the sweatshirt or the other items found in defendant's apartment because the prosecution was able to rely on this circumstantial evidence at trial to support that defendant was the shooter. Defendant does not cite any law that would require the prosecution to attempt to test the items found in defendant's apartment for gunpowder residue or DNA evidence as a matter of course, and he did not request any DNA or gunpowder testing in advance of trial. Finally, defendant has not established prejudice considering all the other evidence tying him to the shooting.

The next issue is whether the prosecution "wrongly exploited the false impression" that the Dodge Charger was at the scene of the incident. As with the items in his apartment, defendant argues the prosecution should have tested the car for gunpowder residue. Detective Lopez did not have the vehicle tested for gunpowder residue because the Flint Township Police Department does not generally test cars for gunpowder residue. More importantly, the jury was able to review this evidence and make reasonable inferences about what weight to give the evidence surrounding the Dodge Charger. Moreover, even if the prosecutor committed a plain error in this circumstance, defendant has not demonstrated prejudice considering all the other evidence that he was at Club What's Next.

VI. JUROR BIAS

Defendant next argues in his Standard 4 brief that he was denied his right to a fair and impartial jury because one of the prospective jurors was a friend of a friend of Detective Lopez.

Defense counsel stated on the record that the defense had no objection to the empanelment of the prospective juror when the court invited him to present an argument on the point. He therefore waived the issue on defendant's behalf. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). Defendant argues that he did not waive the issue because, at the time, Detective Lopez was not a prosecution witness. However, Detective Lopez was on the prosecution's first amended witness list, was the first witness listed on the felony information, was present at trial because she was the officer in charge of the case, and the court introduced her to the jurors. And though Detective Lopez was not identified at the outset of trial in the list of possible prosecution witnesses, Detective Lopez played a pivotal role in the investigation as the officer in charge of the

case, as the officer who interviewed Miles and McFadden, and as the officer who administered the photographic lineups. And she was present throughout trial at the prosecutor's table. So, defense counsel knew when waiving the issue that Detective Lopez would at the very least be mentioned throughout the trial. Therefore, the issue is waived.[5]

## VII. VERDICT FORM

Defendant argues, in his supplemental Standard 4 brief, that the verdict form was defective and deprived him of a fair trial because it did not contain an option for the jury to return a general verdict of not guilty or a "not guilty" option for the lesser included offense of second-degree murder.

An issue regarding the jury-verdict form is generally treated as an issue involving the jury instructions. *People v Eisen*, 296 Mich App 326, 330; 820 NW2d 229 (2012). Ordinarily, "[a] party must object or request a given jury instruction to preserve the error for review." *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000). We note that defendant did not object to the verdict form, and his counsel affirmatively approved the jury instructions at trial, noting that they were "appropriate."

Jury instructions should be read together to determine whether an error occurred. *People v Wade*, 283 Mich App 462, 464; 771 NW2d 447 (2009). "And even if somewhat imperfect, instructions do not create error if they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Id*. A defendant has a right to a properly instructed jury. *Id*. at 467.

In *Wade*, the defendant was charged with first-degree premeditated murder but was convicted of a lesser included offense of involuntary manslaughter, MCL 750.321. *Id*. at 463, 465. The verdict form allowed the jury to select a verdict of guilty or not guilty for the charge of first-degree premeditated murder, or "guilty" of second-degree murder, or "guilty" of involuntary manslaughter. *Id*. at 465. Both lesser included offenses were separated from the option of first-degree murder on the verdict form using the word "or." *Id*. However, the form did not include an option to select not guilty for either lesser included offense, or a general "not guilty" option for all the possible convictions. *Id*. This Court held that the verdict form was constitutionally defective because it did not allow the jury to return a general not-guilty verdict. *Id*. at 468. This Court explained, "We note that the verdict form would not have been defective if it had included a box through which the jury could have found defendant not guilty of second-degree murder and not guilty of involuntary manslaughter." *Id*. This Court noted that the trial court's instructions did not cure the error because the jury did not have the ability to find the defendant not guilty in general, or not guilty of each lesser included offense. *Id*.

---

[5] We reject defendant's unsupported argument that this error fell within the limited class of structural errors warranting automatic reversal of his convictions. Even if this error were structural in nature, we note that defendant does not argue it falls within the limited class of cases requiring a personal waiver by defendant. See *People v Vaughn*, 491 Mich 642, 655-656, 663; 821 NW2d 288 (2012).

In this case, the verdict form appeared, in relevant part, as follows:

We the jury find the Defendant with regard to the following:



POSSIBLE VERDICTS:

You may return only one verdict on each charge. Mark one verdict for each count.

Count 1 First Degree Premeditated Murder

_____ Not Guilty

_____ Guilty of First Degree Premeditated Murder

___✓___ Guilty of Second Degree Murder

The trial court instructed the jury that it could consider whether defendant is guilty of second-degree murder, which the court explained was a "less serious crime." The court outlined the elements of second-degree murder. Later, the court instructed:

> I have already given you instructions regarding a lesser offense. As to any count which includes a lesser offense you must first consider the principal offense. If you all agree that the defendant is guilty of that offense you need not consider the lesser offense. If you believe that the defendant is not guilty of the principal offense or if you cannot agree on that offense, you may consider the lesser offense.

The court then explained:

> The defendant is charged with four counts, that is with the crimes of first-degree premeditated murder, felon in possession of a firearm and two counts of felony[-]firearm. These are separate crimes and the prosecutor is charging that the defendant committed all four of them. You must consider each crime separately in light of all the evidence in the case. You may find the defendant guilty of all or any one or any combination of these crimes, guilty of a less serious crime, or not guilty.

The critical difference between the verdict form in this case and the verdict form in *Wade* is that the form in this case had a general not-guilty option, and the guilty option for second-degree murder was not separated from the not-guilty option using the word "or." The court informed the jury that second-degree murder was a lesser included offense for first-degree premeditated murder, and that the jury had the option to find defendant guilty of first-degree premeditated murder, the less serious offense of second-degree murder, or not guilty of homicide. The jury reasonably would have understood that there were three options: not guilty of any homicide crime, guilty of first-degree premeditated murder, or guilty of second-degree murder. Therefore, the verdict form was not defective and did not deny defendant a fair trial.

## VIII. CUMULATIVE ERROR

Defendant argues in his Standard 4 brief that the cumulative effect of several errors deprived him of a fair trial.

In the context of this issue, defendant raises several of the same errors that we rejected earlier. Defendant presents two new issues in the context of his argument about cumulative error, which include whether the trial court erred by failing to instruct the jury on self-defense and by questioning two jurors in the hallway during voir dire in the presence of counsel but without defendant.

Regarding the hallway voir dire, a defendant preserves the issue of their absence from the voir dire process by objecting at trial. *People v Buie (On Remand)*, 298 Mich App 50, 56; 825 NW2d 361 (2012). Defendant did not object to the hallway voir dire during trial, so the issue is unpreserved. We decline to hold, however, that the issue was waived by counsel's consent to the process and participation in the hallway voir dire. The issue of defendant's right to be present at the voir dire involves defendant's right to be present at the trial. See *Oros*, 320 Mich App 146, 161; 904 NW2d 209 (2017), rev'd in part on other grounds 502 Mich 229 (2018); *Buie*, 298 Mich App at 56-57. This is not a case involving waiver through failure to appear or disorderly conduct. Therefore, this error falls into one of the categories requiring defendant's personal waiver. Trial counsel's consent to the process is not enough to waive the issue. We therefore review the unpreserved error for plain error affecting defendant's substantial rights. See *Carines*, 460 Mich at 763.[6]

Regarding the self-defense instruction, as noted earlier, "[a] party must object or request a given jury instruction to preserve the error for review." *Sabin (On Second Remand)*, 242 Mich App at 657. Defendant did not raise the jury-instruction issue until his sentencing. Therefore, we review the issue for plain error affecting defendant's substantial rights.

"The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Dobek*, 274 Mich App at 106. However, if the defendant cannot establish any errors, then there can be no cumulative effect warranting reversal. *Id.*

With respect to the court's decision, during voir dire, to question two potential jurors in the hallway in the presence of counsel, the court noted that during voir dire there were two occasions in which the court took two prospective jurors into the hallway to discuss certain issues in more detail. The court explained, "We discussed matters that we felt weren't suitable to be placed on

---

[6] Defendant suggests that any error that occurred was structural in nature. We reject that argument. As this Court recently explained, "the '[United States] Supreme Court has never held that the exclusion of a defendant from a critical stage of his criminal proceedings constitutes a structural error.' " *People v Anderson*, 341 Mich App 272, 284; 989 NW2d 832 (2022) (citation omitted).

-17-

the record at the time, and so, we handled it in private." Based on those conversations, the court dismissed the two prospective jurors for cause. Defendant's attorney acknowledged that he was present during the conversations and that it was appropriate for the court to remove the two jurors for cause based on what they revealed during those conversations.

A defendant generally has the right to be present during the voir dire. *Buie*, 298 Mich App at 56. However, "[t]he test for whether defendant's absence from a part of his trial requires reversal of his conviction is whether there was any reasonable possibility that defendant was prejudiced by his absence." *Id*. at 59 (quotation marks and citation omitted). The fact that defendant was not present during the voir dire does not automatically establish prejudice warranting reversal of his convictions. See *id*. at 59-60.

Defendant does not establish any prejudice resulting from his absence during the voir dire of two prospective jurors because those prospective jurors were dismissed for cause and did not become part of the jury. Other than the prospective juror who was friends of friends of Detective Lopez, defendant does not argue that any other allegedly biased individuals were empaneled because of the for-cause dismissal of these two prospective jurors. As discussed earlier, defendant waived his challenge to the unidentified prospective juror who knew Detective Lopez through friends. He also does not point to any other prejudice resulting from the hallway conversations. The mere fact that defendant was not present for those two conversations does not establish prejudice. Nor has defendant established that the hallway voir dire resulted in his conviction despite his actual innocence, or that the court's conduct seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of his innocence, considering the strength of the evidence the prosecution presented at trial. No plain error occurred.

Next, defendant challenges whether the trial court erred by failing to instruct the jury on the law of self-defense when the jury raised the issue during deliberations. MCR 2.513(N)(1), a subrule of the court rule governing jury trials, provides, in relevant part, "After jury deliberations begin, the court may give additional instructions that are appropriate."

Defendant did not present a self-defense theory or request a jury instruction on self-defense during trial. During jury deliberations, the jury asked the court a question about the law of self-defense. The prosecutor noted that self-defense was never an issue that the defense raised at trial. Defense counsel argued that the court had discretion over whether to offer the jury an instruction on self-defense. The court instructed the jury that all the law the jury must consider was within the jury instructions, and self-defense was not one of those instructions.

There was no evidence at trial to support that defendant was acting in self-defense. The Self-Defense Act, MCL 780.971 *et seq*., codified the circumstances in which an individual may use deadly force in self-defense. See *People v Dupree*, 486 Mich 693, 708; 788 NW2d 399 (2010); MCL 780.972. Miles and McFadden both testified that defendant pointed the gun at the group of people in the parking lot and began shooting before there was any return gunfire. There was no evidence to support that defendant honestly and reasonably believed the use of deadly force was necessary to prevent imminent death or great bodily harm when he began shooting into the crowd. So, the evidence at trial did not support a self-defense instruction. Therefore, the trial court did not err by instructing the jury to follow the court's earlier instructions. Defendant also cannot demonstrate prejudice when there was no evidence to support a jury finding of self-defense. No

-18-

plain error occurred.  For this reason, defendant does not establish that the cumulative effect of several errors deprived him of a fair trial.

Affirmed.

/s/ Michael F. Gadola
/s/ Christopher M. Murray
/s/ Christopher P. Yates